# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-4026

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri |
| Shauntel Martin, also known as Boo, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  May 11, 2004
Filed:  September 10, 2004

_____

Before  MORRIS SHEPPARD ARNOLD, McMILLIAN and MELLOY,
    Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Shauntel Martin appeals from a final judgment entered in the United States District Court[1] for the Eastern District of Missouri revoking his supervised release and ordering him to serve twenty-four months in prison. United States v. Martin, No. 4:00CR3 (E. D. Mo. Nov. 25, 2003) (judgment). For reversal, Martin argues that the district court erred in permitting the government to present hearsay evidence at the revocation hearing in violation of Fed. R. Crim. P. 32.1(b)(2)(C) and his

_____

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

constitutional right to confront witnesses against him. For the reasons discussed below, we affirm the judgment of the district court.

## Background

On January 28, 2000, Martin pled guilty to conspiracy to transport a minor in interstate commerce, in violation of 18 U.S.C. § 371. On April 7, 2000, Martin was sentenced to thirty-seven months in prison and three years of supervised release. On July 14, 2003, after Martin had served his initial prison term and while he was on supervised release, his girlfriend, Norma Garcia, reported to the police that she had been raped and sodomized by Martin. Martin was questioned by the police later that day. On September 2, 2003, Martin's probation officer petitioned the district court to revoke his supervised release, alleging that Martin had committed a Grade A violation (the rape and sodomy of Garcia) and two Grade C violations: (1) failure to notify his probation officer within 72 hours of being arrested or questioned by a law enforcement officer and (2) use of a controlled substance (marijuana), as evidenced by multiple positive urine test results.[2]

---

[2]Under the provisions of the sentencing guidelines, violations of probation or supervised release are classified into three grades (Grades A, B, and C). Only Grade A and Grade C violations are at issue in the present case. The class of Grade A violations includes any federal, state, or local offense that is a crime of violence and punishable by a prison term exceeding one year. The class of Grade C violations includes any federal, state, or local offense punishable by a prison term of one year or less and any violation of a condition of supervision. If two or more separate violations have occurred, the most serious violation determines the outcome. If the sentencing court determines that a Grade A violation has occurred, the court *shall* revoke probation or supervised release. If the sentencing court determines that a Grade C violation has occurred, the court *may* revoke probation or supervised release (among other options). See U.S.S.G. §§ 7B1.1, 7B1.3 (2002 Sentencing Guidelines Manual).

On November 25, 2003, the district court held an evidentiary hearing on the government's motion to revoke Martin's supervised release. Martin admitted the facts underlying the two Grade C violations but denied committing the Grade A violation. The district court thus proceeded to hear evidence solely on the sexual assault allegation.

In presenting its case, the government did not call the alleged victim, Garcia, as a witness. The government called Dr. Jeffrey Helwig, the emergency room physician who treated Garcia shortly after the sexual assault allegedly occurred. Martin objected to the possible admission of hearsay statements by Garcia through Dr. Helwig's testimony. The government argued in response that Garcia's hearsay statements were admissible through Dr. Helwig's testimony because of the inherent reliability of Dr. Helwig's testimony and because Garcia was unavailable. The district court overruled Martin's objection and allowed Dr. Helwig to testify. The district court reasoned: "[I]f he's going to be talking about what a patient said to a doctor at a particular time, . . . I think [it] carries a certain reliability, and so I will allow . . . those statements."). See Transcript of hearing at 11 (Nov. 25, 2003).

According to Dr. Helwig's testimony, on July 14, 2003, at approximately 8:58 a.m., he treated Garcia in the emergency room of the Northwest Community Hospital in Arlington Heights, Illinois, after she had been transported there by ambulance. Garcia appeared "upset and distressed" at the time. She reported that her boyfriend had pulled her hair, twisted her arm, and forced her to have vaginal and anal sexual intercourse. Her medical condition was consistent with having been physically and sexually assaulted as she described, although some aspects of her condition were also consistent with the fact that she had recently given birth.[3]

---

[3]As the custodian of Garcia's medical treatment records from her emergency room visit on July 14, 2003, Dr. Helwig authenticated those hospital records, and they were admitted into evidence.

The government also called as a witness Arlington Heights Police Detective Richard Sperando. Over Martin's continuing objection to the admission of any hearsay statements by Garcia, Sperando was allowed to testify regarding statements Garcia had made to him when he interviewed her at approximately 4:00 p.m., on July 14, 2003, at the Arlington Heights police station.

According to Sperando's testimony, Garcia was "excited and upset" at the time of the interview. She reported the following events. During the previous night of July 13, 2003, Garcia and Martin had gone out drinking and partying. In the early morning hours of July 14, 2003, she and Martin were returning home, with Martin driving the vehicle, when they got into an argument. Martin grabbed her by the hair and pulled her head down into his lap. When they reached their apartment complex, he dragged her into the apartment. Inside the apartment, he forced her to have vaginal and anal sexual intercourse. To make him stop, she feigned that she was hyperventilating. She continued to feign illness and asked Martin to take her to the hospital. He agreed. Martin drove Garcia to the hospital but, when he got there, he drove past it. About a mile down the road, she jumped out of the car at a stop light and ran into a nearby police station. At the time of the interview, Sperando could see bruises on Garcia's inner thighs. Garcia further stated that she would not be a witness against Martin because Martin had ties to a "crime family." Garcia reported to him at a later time that Martin's mother had called her and pressured her not to testify against Martin. When state criminal charges were brought against Martin arising out of the incident on July 14, 2003, Garcia was subpoenaed to testify and she showed up in court, but refused to testify against Martin. The state charges against Martin were dismissed.

Sperando further testified that he later questioned Martin at the Arlington Heights police station on July 14, 2003. According to Sperando, Martin came to the Arlington Heights police station voluntarily. Martin denied raping Garcia and claimed that they had engaged in consensual sex until Garcia complained of pain

-4-

from having recently given birth. Martin told Sperando that he had intended to take Garcia to the hospital, but changed his mind when it appeared that she had fallen asleep in the car. After Garcia jumped out of the car at a stop light and ran into the police station, Martin did not assist her further because he did not want to be arrested for drinking and driving.

Martin did not testify at the revocation hearing or call any of his own witnesses. Based upon the evidence before it, the district court ruled as follows:

> Based upon the evidence the Court has heard, I think the Government has proved its case by a preponderance of the evidence.
>
> I think the most persuasive evidence here, and objective evidence, is the doctor's testimony. While I think [defense counsel] does indicate the doctor did say that the vaginal injury could possibly be consistent with the recent childbirth, the rectal evidence was consistent, as he testified, with sexual assault, so even excluding the vaginal injury, which I don't think has to be done, but even if you did that, there's certainly rectal injury.
>
> There are bruises, both on the thighs and the scratches on the arm injury.
>
> That evidence, I think, is objective. It's a doctor observing a patient which is also consistent with the statements made, so that the statements, I think, simply corroborate the physical evidence of the victim here.
>
> And I find that those statements are, as I found earlier, those statements are admissible.
>
> So I think what we do have is forcible sexual assault and I think the Government has proved that both with reliable hearsay and with objective evidence through the doctor's testimony. And the other

evidence of the police officer corroborates what the objective testimony was.

So on that basis, I believe the Government has proved a Grade A violation here, in violation of the general condition that the defendant not commit another federal, state, or local crime.

Transcript of hearing at 43.

Accordingly, the district court revoked Martin's supervised release. Martin was ordered to serve an additional twenty-four months in prison. He timely appealed.

**Discussion**

Martin argues that the presentation of hearsay evidence at the revocation hearing, through Dr. Helwig's and Sperando's testimony, violated his federal constitutional rights and Fed. R. Crim. P. 32.1(b)(2)(C). We review questions arising under the constitution *de novo,* United States v. Pfeifer 371 F.3d 430, 436 (8th Cir. 2004), but we review the claim of a Rule 32.1(b)(2)(C) violation for an abuse of discretion. See United States v. Martin, 371 F.3d 446, 449 (8th Cir. 2004) (Martin) (applying abuse of discretion standard to admissions of out-of-court statements at a supervised release revocation hearing, under Fed. R. Crim. P. 32.1(b)(2)(C)).

In Morrissey v. Brewer, 408 U.S. 471, 487-89 (1972), the Supreme Court discussed the "minimum requirements of due process" applicable in a parole revocation hearing. The Court held that one of those due process requirements is "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." Id. at 489; see also Gagnon v. Scarpelli, 411 U.S. 778, 781-787 (1973) (holding that the same due process requirements apply in probation revocation proceedings as in parole revocation proceedings). In Morrissey v. Brewer, 408 U.S. at 489, however, the

Supreme Court cautioned that a parole revocation hearing should not, for this purpose, be equated with a criminal trial. In other words, the constitutional standard applicable in this type of post-conviction revocation hearing will sometimes permit the admission of evidence that would otherwise be inadmissible in a criminal prosecution. Id. ("[T]he process should be flexible enough to consider evidence . . . that would not be admissible in an adversary criminal trial.").[4]

This limited due process right to confront and cross-examine adverse witnesses in a revocation hearing is codified in Fed. R. Crim. P. 32.1(b)(2)(C), which specifically applies to probation and supervised release revocation hearings. Rule 32.1(b)(2)(C) provides that, in such proceedings, the defendant is entitled to "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."

In United States v. Bell, 785 F.2d 640 (8th Cir. 1986) (Bell), this court devised a test to determine whether evidence has been admitted at a probation revocation hearing in violation of the applicable limited right to confront and cross-examine adverse witnesses. This court held that, to comport with Morrissey v. Brewer, the district court must "balance the probationer's right to confront a witness against the grounds asserted by the government for not requiring confrontation." Bell, 785 F.2d at 642. In assessing the government's position, the district court should consider, first, "the explanation the government offers of why confrontation is undesirable or impracticable" and, second, "the reliability of the evidence which the government offers in place of live testimony." Id. at 643. "[W]here the government demonstrates that the burden of producing live testimony would be inordinate and offers in its place hearsay evidence that is demonstrably reliable, it has made a strong showing of good

---

[4]For this reason, Crawford v. Washington, 124 S. Ct. 1354 (2004), involving the contours of the confrontation right in criminal prosecutions, does not apply to the present case.

cause." Id. If these conditions are met, out-of-court statements may be admitted at a revocation hearing without violating the defendant's limited confrontation right. "Where, on the other hand, the government neither shows that presenting live testimony would be unreasonably burdensome nor offers hearsay evidence that bears indicia of reliability, the probationer is entitled to confrontation." Id.

Since our decision in Bell, we have sometimes held that a district court's failure to engage in the balancing analysis set forth in Bell warrants a remand for the district court to perform that function in the first instance. In United States v. Reynolds, 49 F.3d 423, 426 (8th Cir. 1995) (Reynolds), for example, this court noted that the district court never balanced the defendant's right to confrontation against the government's asserted reason for not producing individuals whose hearsay statements were admitted into evidence at the defendant's supervised release revocation hearing, nor did the district court discuss whether the challenged hearsay evidence was reliable. This court thus concluded: "Since [the district court] had the opportunity to observe the various witnesses who did testify, it is appropriate that the case be remanded so that it may undertake the inquiry called for by United States v. Bell." Reynolds, 49 F.3d at 426; see also United States v. O'Meara, 33 F.3d 20, 21 (8th Cir. 1994) (per curiam) (where the district court did not engage in the required balancing before admitting the challenged hearsay evidence, vacating the judgment revoking supervised release and remanding to the district court with instructions to conduct another revocation hearing).

However, where the district court has failed to engage in the balancing analysis set forth in Bell, but the underlying facts have been sufficiently developed, this court may itself perform the Bell analysis on review. In United States v. Zentgraf, 20 F.3d 906 (8th Cir. 1994) (Zentgraf), for example, the district court allowed the government to rely on hearsay evidence at the defendant's supervised release revocation hearing and thereafter revoked the defendant's supervised release without engaging in the Bell balancing analysis. On appeal, this court held that the government had failed to

show good cause for denying the defendant the opportunity to confront the adverse witness at the revocation hearing. Id. at 910. We therefore reversed and remanded, with instructions to the district court to reconsider the government's revocation request without the improper hearsay evidence. See also Martin, 371 F.3d at 446 (performing Bell balancing test on appeal and concluding that district court improperly admitted out-of-court statements of one individual but did not abuse its discretion in admitting out-of-court statements of another, and affirming revocation on basis that properly admitted evidence sufficiently established a violation of the defendant's conditions of supervised release).

In the present case, Martin argues that the government has failed to adequately explain its failure to present Garcia's live testimony. Martin points out that, although Sperando did testify regarding Garcia's refusal to testify against Martin in state court, those state court proceedings occurred more than a year before the revocation hearing and yet, since those state court proceedings, the government had made no attempt to interview or subpoena Garcia. Moreover, Martin contends, there has been no showing that Garcia's alleged reason for refusing to testify (i.e., her fear of retaliation by a "crime family") is well-founded. Consequently, Martin argues, the government has failed to show that the burden of producing Garcia's live testimony is inordinate. See, e.g., United States v. Comito, 177 F.3d 1166 (9th Cir. 1999) (where revocation of supervised release was based primarily upon the probation officer's account of the defendant's girlfriend's unsworn claim that the defendant had used her credit cards without her permission, her hearsay statements had been improperly admitted where the government had not subpoenaed her or shown that she had a well-founded fear of retaliation).

Furthermore, Martin argues, the mere finding that Garcia's statements to Dr. Helwig were inherently reliable does not alone suffice to establish the admissibility of her hearsay statements. See, e.g., Zentgraf, 20 F.3d at 910-11 (hearsay evidence was improperly admitted where the government failed to show

good cause for not producing the live witness, even though there was "an adequate basis for finding [the out-of-court] statement reliable").

In the present case, the government did offer an explanation for why the burden of producing Garcia as a live witness was inordinate. The government presented evidence that Garcia repeatedly stated that she would not testify against Martin and that, when Garcia was subpoenaed to testify against Martin in state court, she appeared in court but refused to testify. The government believed that Garcia likewise would not testify against Martin at his supervised release revocation hearing and that serving her with a subpoena would be futile. The government also demonstrated that the hearsay evidence was reliable. Garcia's statements to Dr. Helwig and Detective Sperando regarding the relevant events were corroborated by objective medical evidence and physical injuries that were visible at the time. The evidence also established that Garcia was excited and distressed both at the time of her physical examination by Dr. Helwig and at the time of her interview by Sperando. Under the particular facts of this case, her state of mind adds an indicia of reliability.

Notwithstanding the district court's failure to expressly balance, on the one hand, Martin's limited right to confront Garcia as an adverse witness and, on the other hand, the government's asserted grounds for not requiring confrontation, we hold that the government met its burden to show good cause for not producing Garcia as a live witness at the revocation hearing. See Bell, 785 F.2d at 643 (showing that burden of producing live testimony would be inordinate and that hearsay evidence is demonstrably reliable establishes a strong showing of good cause for the lack of confrontation). In effect, the district court's failure to engage in the Bell balancing analysis on the record was harmless error in the present case.

## Conclusion

The admission of Garcia's out-of-court statements at Martin's supervised release revocation hearing did not violate Martin's constitutional rights or Fed. R. Crim. P. 32(b)(2)(C). The judgment of the district court is affirmed.

_____