# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3195

_____

United States of America

*Plaintiff - Appellee*

v.

Craig A. Sutton

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 15, 2018
Filed: March 5, 2019

_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.

_____

KELLY, Circuit Judge.

Craig Sutton appeals the revocation of his supervised release based on the allegation that he committed assault in June 2016. At the final revocation hearing, the government introduced videos and transcripts of police interrogations of three witnesses who had a connection to the assault. None of the three witnesses appeared at the hearing to provide live testimony, and Sutton objected that introduction of their

interrogations deprived him of his right to confrontation. The district court overruled his objection. Relying almost exclusively on the interrogations, the district court concluded that Sutton more likely than not committed the assault and revoked his supervised release. We conclude that admission of the interrogations was erroneous and accordingly reverse.

I

In 2013, Sutton pleaded guilty to being a felon in possession of a firearm and was sentenced to 46 months of imprisonment and three years of supervised release. Sutton was released on supervision on May 13, 2016. On June 20, 2016, police discovered Thomas Eisenbarth lying in a pool of blood inside his own Buick LeSabre, which was parked near the Truman Medical Center. Eisenbarth was unconscious and had been severely beaten. Although Eisenbarth survived the attack, he had no memory of who had attacked him. A surveillance tape showed Eisenbarth's vehicle being parked at the location around 11:00 p.m. on Sunday, June 19, approximately eleven hours before police discovered Eisenbarth. The video shows a man in black clothing exiting the vehicle and getting into the passenger side of a gold Chevy Blazer, which then departs the scene.

Police learned that Eisenbarth was in a romantic relationship with Cliniesha Douglas. When police went to Cliniesha's home, they discovered her gold Chevy Blazer parked outside. Blood was smeared on the dashboard. Police knocked on the door of the house, and Cliniesha's brother, Ezekiel Douglas, answered the door dressed in all black. Police found blood in various rooms of Cliniesha's house, on the front porch, and on cleaning supplies. They arrested Cliniesha and Ezekiel.

After advising them of their Miranda rights, Detectives Terrence Owens and Michael Buckley separately interviewed Cliniesha and Ezekiel, off-and-on, for more than six hours. During the interrogations, Cliniesha and Ezekiel provided accounts

-2-

that were internally inconsistent, in conflict with one another, and contradicted by the physical evidence. The detectives repeatedly accused both individuals of lying, and both Cliniesha and Ezekiel confessed to making false statements during the interviews. Because the specifics of their statements are important for our analysis, we summarize them in some detail.

Cliniesha initially denied knowing anything about the assault. She acknowledged that she was in a relationship with Eisenbarth and that she had previously been in a relationship with Sutton, who is the father of two of her children. At first, she told the detectives that only four people had been at her house that Sunday: herself, her brother Ezekiel, her minor daughter, and Eisenbarth. She stated that she had been drinking heavily and that she periodically blacked out or fell asleep. She said she had fallen asleep on the couch next to Eisenbarth, and when she awoke around 11:00 p.m., he was gone. She repeatedly stated that Sutton had not visited her house that day.

Cliniesha then told the detectives that Sutton had indeed come to her home that day but that she had not let him inside. Later, she changed her story again, and said that Sutton had come inside, pushing past her and confronting Eisenbarth. But she did not describe any type of physical altercation, and indicated that Eisenbarth left in his own car around 7:00 or 8:00 p.m. Cliniesha later said that Sutton called her and told her that he had confronted Eisenbarth at a gas station. She claimed that Sutton told her he had hit Eisenbarth, that he and his cousin "Ferman" had "fucked him up," and that Sutton had taken Eisenbarth to the hospital. Later in the interrogation, Cliniesha admitted that she had fabricated the gas station detail.

Cliniesha eventually changed her story again, and said that she had witnessed Sutton, along with his cousin Jermaine Oliver, attack Eisenbarth inside her house. But Cliniesha stated that the injuries they inflicted were minor relative to the life-threatening wounds that Eisenbarth ultimately suffered. She described Eisenbarth as

-3-

"fine," and certainly not unconscious. According to Cliniesha, Sutton and Oliver then left, and Eisenbarth and Ezekiel remained at the house. Cliniesha said she fell asleep, and when she awoke later that evening, Eisenbarth and Ezekiel were gone, as was her Chevy Blazer. She said she called Ezekiel, who said he had gone to their mother's house but was coming back. She said that Sutton then came back and asked Ezekiel for a ride. Cliniesha said her brother later told her that he had gone and picked up Sutton from near the hospital in her Blazer. She attested that she had not seen Sutton since, and that only Ezekiel and her daughter were in the house the next morning when she woke up.

Throughout her interrogation, Cliniesha claimed not to have witnessed the assault that nearly killed Eisenbarth. Yet later, at the revocation hearing, Detective Buckley agreed that Cliniesha appeared to have blood under her fingernails. During her interrogation, Cliniesha provided no explanation as to how she acquired blood under her fingernails, why there was blood in various rooms of her house, or why she did not contact the police upon learning that Eisenbarth had been severely injured. Although Cliniesha at times expressed fear that Sutton or one of his associates would harm her, she also stated at least once that she was "not scared of him."

Ezekiel's initial story to police was that he similarly knew nothing about an assault on Eisenbarth. He told the detectives that many people were hanging around Cliniesha's house on Sunday, including Sutton and his friends. Although Ezekiel admitted he had been drunk that day, he claimed to remember the day's events. He confirmed that Cliniesha was drinking and lost consciousness repeatedly throughout the day, perhaps as many as a dozen times.

Ezekiel said that he left Cliniesha's house around 7:00 p.m. with his cousin to walk to the liquor store, and when he returned, Eisenbarth and his car were gone. Ezekiel claimed he had not seen Eisenbarth since. Upon his return to the house, Ezekiel noticed that his sister's Blazer was missing, but that Sutton's Cadillac was

still parked outside. He claimed that when he went inside the house, his sister told him that Sutton had borrowed her car but would be back soon.

Crucial details of Ezekiel's story changed during his interrogation. Later, he told the detectives that he drove his sister's Blazer to the liquor store shortly before midnight with his cousin. He claimed that, after finding the liquor store closed, they made it to a second store just before closing, which he estimated was around 11:55 p.m. He then drove back to his sister's house, where Sutton and his friends were still partying. He then claimed he walked down the street with his cousin to get away from the party and when he returned, his sister's Blazer was gone.

The detectives then confronted Ezekiel with the details of the surveillance video, which showed Eisenbarth's vehicle and Cliniesha's Blazer at the parking lot by the Truman Medical Center at 11:06 p.m. After learning this information, Ezekiel changed his story again and said that Sutton had borrowed Cliniesha's Blazer just *before* his trip to the liquor store, implying that Sutton had returned the car around 11:30 p.m. Ezekiel also stated that Sutton was acting strange, and began looking for cleaning supplies in the kitchen and went to the bathroom to wash his clothes. Ezekiel denied having driven Sutton anywhere.

After a break in the interrogation and significant prodding by the detectives, the final version of Ezekiel's story emerged. Detective Owens began by telling Ezekiel, "I don't need another suspect, I need a witness." Detective Owens told Ezekiel that he knew Ezekiel had driven his sister's Blazer to the hospital, where Sutton jumped in after abandoning Eisenbarth's car. In response, Ezekiel stated that he did give Sutton a ride *after* his midnight run to the liquor store, and that Sutton got out of the Blazer and *into* another vehicle. This account is inconsistent with surveillance video showing a man getting *out* of Eisenbarth's vehicle and into the passenger side of the Blazer at 11:06 p.m. Moments later, Ezekiel changed his story again and said that Sutton actually got out of another car and into the Blazer, but he

had no idea that this occurred near a hospital. Although Ezekiel ultimately denied witnessing the assault on Eisenbarth or knowing that Eisenbarth was left bleeding in his own vehicle, the police found what appeared to be blood on his fingers.

Much of what Ezekiel told detectives—even basic facts unrelated to the assault—differed from his sister's account. For instance, Ezekiel described at length the food he prepared at the Sunday barbeque the day of the assault; Cliniesha stated unequivocally that no barbeque occurred. Ezekiel said that Sutton slept at Cliniesha's house the night of the assault, which she denied. Ezekiel even described Cliniesha as his "twin," and said they were born only a few minutes apart, while Cliniesha said that Ezekiel was a year younger than she was.

Ezekiel expressed fear of retribution from Sutton, and mentioned that several of Sutton's friends were carrying firearms the night of the assault. Ezekiel admitted that he disliked Sutton because, years earlier, Sutton had assaulted Cliniesha, putting her in a coma. Ezekiel stated that he wanted to hurt Sutton for this, and that he had threatened to kill Sutton in the past. Ezekiel also admitted that, on the day that Eisenbarth was assaulted, Cliniesha told Ezekiel that Eisenbarth had raped her. In her interrogation, Cliniesha denied having any conflict with Eisenbarth and did not mention the rape allegation.

The police also interviewed Sutton's cousin Oliver. The detectives observed that Oliver's right hand appeared to be swollen. After repeatedly denying that he had been involved in the assault, Oliver eventually admitted to having hit Eisenbarth once in the shoulder. Oliver denied that this caused Eisenbarth any serious injury; when Oliver left Cliniesha's home, he claimed Eisenbarth was fully conscious. Oliver said he went to work from 8:00 p.m. until 4:00 a.m. the following morning. Sutton later told him that "it went bad," and that Cliniesha had one of "her episodes," during which she kicked Eisenbarth.

In his own interrogation, Sutton denied knowing anything about the assault. Sutton was physically examined but had no abrasions or bruises. No evidence of blood was found under his fingernails or in his car.

II

Sutton was initially charged in state court with assaulting Eisenbarth, but the charges were dismissed. The government petitioned to revoke Sutton's supervised release based on the assault allegation, and Sutton was taken into custody. At the final revocation hearing, held more than a year after the assault, only Detective Buckley testified. He summarized the interrogations that he and Detective Owens conducted of Cliniesha, Ezekiel, Oliver, and Sutton, and the court admitted the interrogation tapes and transcripts into evidence. Detective Buckley testified that he had attempted to serve subpoenas on Cliniesha and Ezekiel at the house where the assault occurred but that neither of them currently lived there. He located another address for Cliniesha but no one came to the door when he visited the residence. He did not testify that he ever attempted to subpoena Oliver or ever attempted to locate an alternative address for Ezekiel.

Both at the hearing and in post-hearing briefing, Sutton objected to the admission of the interrogations of Cliniesha, Ezekiel, and Oliver as hearsay, violations of his constitutional rights, and violations of Federal Rule of Criminal Procedure 32.1. The district court overruled those objections and revoked Sutton's supervised release. It sentenced Sutton to 24 months' imprisonment—the statutory maximum—and one year of supervised release.

On appeal, Sutton renews his challenges to the admission of the interrogations of Cliniesha, Ezekiel, and Oliver. We ordinarily review a claim under Rule 32.1 for an abuse of discretion, but because Sutton argues that admission of the hearsay

evidence violated his right to due process, we review de novo. United States v. Johnson, 710 F.3d 784, 787 (8th Cir. 2013).

III

A revocation hearing is not a criminal trial, and a defendant on supervised release is not entitled to the full panoply of protections afforded by the rules of evidence. Morrissey v. Brewer, 408 U.S. 471, 480 (1972); United States v. Black Bear, 542 F.3d 249, 253, 255 (8th Cir. 2008). Federal Rule of Criminal Procedure 32.1(b)(2)(C) nonetheless gives a defendant the opportunity to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." See Morrissey, 408 U.S. at 488–89 ("[T]he minimum require-ments of due process . . . include . . . the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)."). This rule requires the court to balance the defendant's due process right to confront and cross-examine witnesses during such proceedings "against the grounds asserted by the government for not requiring confrontation." United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986).[1]

Under Bell, the court must evaluate two factors to determine if good cause justifies limiting the defendant's confrontation rights in a particular case. First, "the court should assess the explanation the government offers of why confrontation is undesirable or impractical," such as when "live testimony would pose a danger of

---

[1]In Bell, we described Morrissey as holding that the right to confrontation at a parole revocation hearing derives from the Sixth Amendment. 785 F.2d at 642. However, Morrissey grounded its reasoning in due process, not the Sixth Amendment, 408 U.S. at 489, and we have since clarified that because "a revocation of supervised release is not part of a criminal prosecution," the right to confrontation afforded at such hearings comes from due process. United States v. Ray, 530 F.3d 666, 668 (8th Cir. 2008).

physical harm to a government informant." Id. at 643. Second, the government must establish "the reliability of the evidence which the government offers in place of live testimony." Id. To demonstrate good cause, the government must prove both factors; only if it shows "that the burden of producing live testimony would be inordinate *and* offers in its place hearsay evidence that is demonstrably reliable" will good cause exist. United States v. Zentgraf, 20 F.3d 906, 910 (8th Cir. 1994) (quoting Bell, 785 F.2d at 643).

Applying the Bell factors to the testimony of the three witnesses at issue in this case, we conclude that the government failed to meet its burden on either factor and that Sutton was entitled to confrontation.

A

Under the first Bell factor, the government must prove that confrontation would be either impractical or undesirable. Live testimony may be impractical when transporting the witness to the judicial forum from another state would be "unreasonably burdensome." See, e.g., United States v. Harrison, 809 F.3d 420, 423 (8th Cir. 2015) (finding it "would have been unreasonably burdensome, impractical, and costly" to procure live testimony of Virginia officers in Missouri "given the considerable distance they would have been required to travel"); United States v. Martin, 371 F.3d 446, 449 (8th Cir. 2004) (finding first factor satisfied because witness needed in Missouri "was in Texas and could not be found"). Where the witness is located within the same state as the revocation hearing, however, procuring live testimony generally does not impose an inordinate burden on the government. See Bell, 785 F.2d at 644–45 (concluding that "[t]here was no showing whatever that producing the live testimony of the police officers involved would have presented any significant difficulty" because "[a]ll of them were within the State of Arkansas").

Here, there is no evidence that Cliniesha, Ezekiel, or Oliver had moved outside the Kansas City area, so the government cannot establish that it would have been unreasonably burdensome to transport them to the revocation hearing. The government nonetheless argues that confrontation was impractical because it attempted to subpoena the witnesses' live testimony but was unsuccessful. That argument is unpersuasive. It appears Detective Buckley made no attempt to subpoena Oliver. Detective Buckley apparently did not try to contact Ezekiel at the address he provided during his interrogation, via the phone number he provided, or through his parole officer. Instead, Detective Buckley testified that he attempted to serve subpoenas on Cliniesha and Ezekiel at the house where Eisenbarth was assaulted. When he learned that neither individual currently lived there, he made one further attempt to subpoena Cliniesha at another address but then abandoned his efforts entirely.

The government urges us to infer that, if called to testify, each of the witnesses would have refused out of fear of Sutton. We have in the past found that a witness's refusal to testify can satisfy the government's burden under the first Bell factor. See United States v. Martin, 382 F.3d 840, 846 (8th Cir. 2004). In Martin, the witness repeatedly stated that she would not testify at the revocation hearing. Indeed, when subpoenaed in a related state court proceeding, she appeared but refused to testify. Id. Requiring the government to again subpoena the witness to appear at the revocation hearing, we concluded, would have been a futile exercise. Id.

Here, none of the three witnesses ever refused to comply with a subpoena or stated that they would do so. Detective Buckley indicated that he believed Sutton's state assault charge was dropped because the witnesses were "uncooperative," but did not state that they had refused to appear when subpoenaed. Both Cliniesha and Ezekiel expressed fear of retribution from Sutton during their interrogations, but this fear was apparently not so great so as to prevent them from making voluntary recorded statements to the police. See Zentgraf, 20 F.3d at 910 ("A prisoner-witness'

-10-

'preference' not to testify, even though motivated by a concern about being labeled a snitch, does not make his live testimony undesirable or impractical, at least absent a satisfactory showing that testifying would place the prisoner-witness in danger of great bodily harm . . . ."). During his interrogation, Oliver never indicated that he feared Sutton. The government has presented no evidence indicating that subpoenaing these witnesses' live testimony would present any greater danger of reprisal than using their recorded interviews. Accordingly, the government failed to demonstrate that attempting to procure these witnesses' live testimony through subpoenas would have been futile.

B

The statements of Cliniesha, Ezekiel, and Oliver were not reliable enough to overcome Sutton's right to confrontation. Each witness's account was oral and unsworn, the "least reliable type of hearsay." United States v. Comito, 177 F.3d 1166, 1171 (9th Cir. 1999); accord United States v. Redd, 318 F.3d 778, 784 (8th Cir. 2003). All three witnesses were at times admittedly untruthful, had accounts that were internally inconsistent and inconsistent with one another, and demonstrated motives to minimize their own involvement in the assault.

Starting with Cliniesha, several factors weigh against the reliability of her statement. She conceded to police that she was drinking heavily the day of the assault and periodically lost consciousness throughout the day. The internal inconsistencies in her account are myriad, especially on key details about whether and when Sutton was present at her house and whether she witnessed him hit Eisenbarth. Cliniesha's story differed markedly from Ezekiel's and conflicted with Oliver's statement implicating her as a main participant in the assault. It does not explain some of the physical evidence, such as how she acquired blood under her fingernails. The evidence also reveals possible motives for Cliniesha to mislead law enforcement. Ezekiel told police that, on the day of the assault, Cliniesha had accused Eisenbarth

-11-

of raping her. And although Ezekiel said Cliniesha was trying to rekindle her romantic relationship with Sutton, she had also accused Sutton of harming her in the past.

Cliniesha's allegation of rape could have given Ezekiel, whose story is equally inconsistent, a motive to harm Eisenbarth as well. Although Ezekiel denied driving Eisenbarth's car or knowing anything about the assault, his clothing matched the description of the individual seen parking Eisenbarth's car near the hospital where Eisenbarth was later found. He also admitted to driving Cliniesha's Blazer around the time the vehicle is visible on the surveillance video near the hospital. Blood was found on the dashboard of the Blazer and Ezekiel's fingers appeared to have blood on them. And Ezekiel readily admitted his animus toward Sutton, whom he had previously threatened to kill.

Oliver's account was perhaps the most credible, but he too was untruthful. He initially denied knowing anything about the assault. Only later did he concede that he had hit Eisenbarth once before leaving Cliniesha's residence. His description of his subsequent conversation with Sutton strongly implicates Cliniesha in the attack, which she denies. And even if we were to find Oliver's statements reliable, he was not unavailable and thus Sutton retained the right to confront him. Zentgraf, 20 F.3d at 910.

It is possible that some version of these various accounts approximates what really happened the night Eisenbarth was brutally assaulted, but none of these witnesses was sufficiently reliable so as to make cross-examination unnecessary. Collectively, their stories reveal numerous indicia of *un*reliability: intoxication, potential culpability in the crime, lapses in memory, repeated falsehoods, and motive to implicate the defendant. Because the government failed to satisfy its burden under Bell, the unsworn statements of Cliniesha, Ezekiel, and Oliver should not have been admitted at Sutton's revocation hearing.

## IV

Accordingly, the order of the district court is reversed and the case is remanded for further proceedings as the district court deems necessary.

_____