# United States Court of Appeals
### For the Eighth Circuit

———————————————

No. 20-2623

———————————————

United States of America

*Plaintiff - Appellee*

v.

Derone Coleman

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

——————————

Submitted: April 16, 2021
Filed: August 4, 2021

——————————

Before KELLY, GRASZ, and KOBES, Circuit Judges.

——————————

GRASZ, Circuit Judge.

Derone Coleman challenges the district court's decision to rely primarily on hearsay evidence to revoke his supervised release. We reverse the judgment, vacate Coleman's revocation sentence, and remand for resentencing on a closed record.

# I. Background

Coleman was serving a 60-month supervised-release term after he served a 106-month term of imprisonment for a drug trafficking crime. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C); 18 U.S.C. § 924(c)(1)(A). As a condition of his release, Coleman could not commit another federal, state, or local crime. So, when Kippie House told probation and local police officers that Coleman assaulted her, the government asked the district court to revoke Coleman's supervised release.

According to the government, on May 31, 2020, Coleman bit, tried to choke, and waved his gun at House. Two days later, House called Coleman's probation officer, Stephanie Werning, to report the assault. Werning testified that while House sat in the driver's seat of her car next to her friend, Lashonda Elam, House spoke to Coleman about their past relationship. Suddenly, he "snapp[ed] and reach[ed] into the car and chok[ed] her out." At that point, Elam purportedly leaned from the passenger's seat to remove Coleman's hand from House's throat. Two of Coleman's cousins also intervened by grabbing Coleman and pulling him away from House. With both hands behind his back, Werning said, Coleman then reached forward to bite House's face. Werning went on to relay that once the cousins moved Coleman away from the car, Coleman pulled his gun out and waved it at House before she drove off. After speaking on the phone, House texted photographs of her injuries to Werning.

The same day she called Werning, House went to the police station and met with Officer John Mogilnicki. As Mogilnicki explained, House's conversation with him generally traced her conversation with Werning. Additionally, House provided Elam's name, date of birth, and address. But he did not get Coleman's cousins' names. Last, he photographed her apparent injuries, showing House's bruised left eye and marks on her neck. Werning testified that the photographs House sent her matched the photographs that Mogilnicki took.

On June 30, 2020, House spoke with Detective Jernisha Cann. House allegedly "stated that she was moving from her current location and was moving out of town" but "[s]he didn't give an exact location to where." Further, the record does not show that Cann ever asked whether House was moving out of state, when she was planning on moving, and whether she would still have access to her car. Likewise, the record does not tell us if Cann tried to verify whether House had already moved.

Two weeks later, Werning tried to subpoena House at her last-known address. Because the residence looked abandoned, Werning first called House. House claimed to be homeless and agreed to meet Werning in Kansas City to discuss living options, giving Werning a chance to serve House with a subpoena. After waiting for thirty minutes without seeing House, Werning left. Werning did not indicate whether House was moving out of town, only that Werning believed that House had no place to go.

After the failed meeting, Werning called House three times in the days leading up to the show-cause hearing, without any answer from House. Cann also tried calling House twice during that timeframe. Both Werning and Cann testified that before these attempted phone calls, House had expressed a willingness to drop the charges, while suggesting that Coleman needed mental health treatment, not punishment. Other than the phone calls and the failed meeting, neither Werning nor Cann did anything else to subpoena House. Werning said she did not seek any law-enforcement assistance in serving the subpoena on House.

Of the three alleged on-scene witnesses, Werning and Cann only tried to track down Elam. Each tried contacting her by phone but did not try to visit her address. Although House did not identify Coleman's cousins, nothing in the record shows an attempt to discover their names, phone numbers, or addresses. Similarly, Mogilnicki never attempted to track down Elam or the cousins because internal protocols required him to pass the information on to the domestic violence unit. And when he

asked the domestic violence unit about Elam, a detective in the unit told him that "they would handle anything further with the witness."

On July 16, five days before the hearing, the government listed five people on its proposed witness list: (1) Cann; (2) Mogilnicki; (3) Werning; (4) House; and (5) Elam. The government listed each witness as a Kansas City resident. Because the government failed to produce House and Elam, stating that its "[e]fforts to serve them have been unsuccessful[,]" only the first three testified at the hearing, offering no more than hearsay evidence. Coleman objected before each witness testified about what House told them, arguing that he had a right to confront his accuser. *See United States v. Bell*, 785 F.2d 640, 642 (8th Cir. 1986) (requiring the government to show good cause before denying a probationer's confrontation rights). The district court overruled each objection.

The district court concluded that the government's explanation, based on the officers' testimony, showed good cause for House's absence at the revocation hearing. It did not offer any further analysis for excusing House's unavailability. With respect to reliability of the hearsay evidence, while recognizing the limitations of the court's "nonexpert opinion[,]" the district judge noted that the injuries in the photographs "do not appear acutely fresh and consistent" with the narrative on record. Even so, the district court viewed the photographs as consistent with House's alleged statements about the assault, offering no other analysis on the reliability of the hearsay evidence.

On appeal, Coleman reasserts his hearsay challenge, arguing that overruling those objections violated his due process and confrontation rights. He asks us to vacate his revocation sentence and to remand this case to consider the supervised-release violation anew without expanding the record.

## II. Discussion

While we would ordinarily review challenges to the admission of hearsay evidence for abuse of discretion, when an appellant claims that the government violated his due process rights, we review that challenge de novo. *United States v. Timmons*, 950 F.3d 1047, 1050 (8th Cir. 2020).

At the revocation stage, a defendant has less than "the full panoply of protections afforded by the rules of evidence." *United States v. Sutton*, 916 F.3d 1134, 1138 (8th Cir. 2019). But "minimum requirements of due process" still apply. *Timmons*, 950 F.3d at 1050 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)). Among them "the right to 'confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation).'" *Id.* (quoting *Morrissey*, 408 U.S. at 489). Rule 32.1(b)(2)(C) "implements this protection and requires the district court to provide defendants 'an opportunity to . . . question any adverse witnesses unless the court determines that the interest of justice does not require the witness to appear.'" *Id.* (quoting Fed. R. Crim. P. 32.1(b)(2)(C)).

"In assessing whether a defendant should have been allowed to confront an adverse witness, we balance his due process rights 'against the grounds asserted by the government for not requiring confrontation.'" *Id.* (quoting *Bell*, 785 F.2d at 642). The *Bell* test provides: "[t]o show good cause for denying a defendant his confrontation rights, the [g]overnment must show that 'confrontation is undesirable or impractical' and that 'the evidence which the government offers in place of live testimony' is reliable." *Id.* (quoting *Sutton*, 916 F.3d at 1139).

Thus, the district court needed to assess: (1) the government's reason for not producing House; *and* (2) the reliability of the hearsay offered in place of her testimony. *See United States v. Simms*, 757 F.3d 728, 732 (8th Cir. 2014) (citing *Bell*, 785 F.2d at 643). The government needed to show both prongs; a failure under either prong negates good cause. *Sutton*, 916 F.3d at 1139. In the revocation

-5-

context, "[w]e will only reverse for error that is not harmless." *Timmons*, 950 F.3d at 1050 (citing *United States v. Black Bear*, 542 F.3d 249, 255 (8th Cir. 2008)).

## A.  Availability

Coleman argues that the government did not meet its burden to explain why it did not produce House.  "Live testimony may be impractical when transporting the witness to the judicial forum from another state would be 'unreasonably burdensome.'"  *Sutton*, 916 F.3d at 1139.  However, the government generally fails to meet its burden under the first *Bell* prong if "the witness is located within the same state as the revocation hearing" because securing the witness's live testimony "does not impose an inordinate burden on the government."  *Id.*

Here, the government did not provide any evidence to show that House left Missouri.  Although two witnesses testified that House told them she was in the process of moving, nothing in the record shows that she did.  Instead, six days before the hearing, as far as Werning knew, House agreed to meet her in Kansas City.  Even though she did not follow through with the meeting, House claimed to be in the area. And five days before the hearing, the government—while suspecting House was homeless and moving out of town—identified House as residing in the same city where the hearing would occur.

Yet, the government argues that House's unresponsiveness to phone calls rendered her unreachable.  We disagree.  If we were to adopt the government's position, then we would effectively equate missed calls to an interstate move. Nothing in the record shows that the government: (1) used any resources to look for House's car; (2) asked House where she planned to move; or (3) asked for House's new address.  *See Sutton*, 916 F.3d at 1138–40 (holding that he government failed to show confrontation was impractical even when a detective went as far as locating a witness's new address after a failed subpoena attempt to an older address but abandoned the effort after a second unsuccessful attempt).

And even if the timeframe made it difficult to subpoena House, nothing in the record shows that the government—in moving for relief—ever asked the district court for more time to serve that subpoena. *See Timmons*, 950 F.3d at 1051 (citing *United States v. Johnson*, 710 F.3d 784, 790 (8th Cir. 2013)) (concluding that the government should not have moved forward without live testimony when a witness's absence from a revocation hearing was due to some factor other than unavailability or fear of reprisal, like there, a miscommunication).

This court has "excused the [g]overnment from calling a witness who it knows will refuse to testify out of fear." *Timmons*, 950 F.3d at 1051; *see United States v. Martin*, 382 F.3d 840, 845–46 (8th Cir. 2004) (holding that serving a witness with a subpoena would be futile when they repeatedly refused to testify out of fear). The government argues that *Martin*, which struck down a defendant's hearsay challenge when a witness's fear made it futile to subpoena her, should govern here. *See Martin*, 382 F.3d at 845–46. According to the government, House's change of heart about pressing charges made it futile to try to get her to testify.

We disagree. Although House changed her mind about pressing charges, unlike *Martin*'s witness, nothing in the record suggests House refused to comply with a subpoena or said that she would not testify. *See Sutton*, 916 F.3d at 1139–40 (holding that the government failed to show an attempt to subpoena three witnesses would have been futile when none of them refused to comply with a subpoena).

Lastly, a witness's reluctance to testify falls short of satisfying the first *Bell* prong "absent a satisfactory showing that testifying would place [her] in danger of great bodily harm[.]" *United States v. Zentgraf*, 20 F.3d 906, 910 (8th Cir. 1994). Here, the government did not try to show that House would face any more danger by testifying than she did when she first filed the police report. *See Sutton*, 916 F.3d at 1140 (holding that fear to testify in court is not enough reason to deny a defendant's confrontation rights when the adverse witnesses made voluntary statements to the police). Thus, we conclude that the government lacked a reasonably satisfactory explanation for House's unavailability.

## B. Reliability

Under the second *Bell* prong, the government must show that the hearsay evidence was reliable enough to justify the denial of Coleman's confrontation rights. *Bell*, 785 F.2d at 643. Coleman argues that even if it had been impractical or undesirable to produce House, the government has failed to show that reliability outweighs his confrontation rights. In the revocation context, we have characterized oral, unsworn accounts as the "least reliable type of hearsay." *Sutton*, 916 F.3d at 1140 (quoting *United States v. Comito*, 177 F.3d 1166, 1171 (9th Cir. 1999)). "Similar statements may nevertheless be reliable if corroborated by other evidence." *Timmons*, 950 F.3d at 1051. We have also questioned the reliability of police reports. *See Bell*, 785 F.2d at 643–44 ("While police reports may be demonstrably reliable evidence of the fact that an arrest was made, they are significantly less reliable evidence of whether the allegations of criminal conduct they contain are true." (internal citation omitted)).

Here, the government relies solely on oral, unsworn accounts and photographs. The district court matched the hearsay statements with the photographs. But it never analyzed the reliability of the evidence in reaching that conclusion. Even if the photographs matched House's oral, unsworn statements, the government still did not give the district court enough evidence to answer the "who," "when," and "how" behind her injuries. Beyond the hearsay evidence and the police report, the government did not present corroborating evidence to even allow the district court to draw a causal link between allegations about Coleman's conduct and House's injuries. *See Timmons*, 950 F.3d at 1051 (holding that neither a 911 hang-up call nor an alleged victim's injuries offer enough corroborating evidence to draw a causal link with the defendant based on oral, unsworn statements). The photographs alone do not corroborate the hearsay statements enough to meet *Bell*'s reliability prong.

The government had the burden to present corroborating evidence to show reliability. Even though each government witness expressly acknowledged that

-8-

House mentioned three on-scene witnesses (Elam and Coleman's two cousins), nothing in the record shows that the government tried to gather corroborating evidence from them. House (allegedly) gave Elam's contact information to the police, including Elam's name, date of birth, and address. But after two unreturned phone calls, the government did nothing else to try to reach Elam. Nothing in the record shows that the government took any steps to identify Coleman's cousins, let alone contact either one. Similarly, nothing in the record shows that the government tried to find video surveillance from the scene, inspect House's car, or call an expert witness to testify about House's injuries. And so, lacking corroborating evidence, the government failed to meet its burden to show reliability of the hearsay evidence.

Coleman also argues that House's motive to fabricate claims against him also weighs against reliability. In the revocation context, we have recognized that motive to implicate a defendant can indicate unreliability. *See Sutton*, 916 F.3d at 1140–41 (taking motive to implicate a defendant as indicia of unreliability of hearsay statements from a witness who had readily admitted animus toward the defendant). Here, the witnesses testified that House admitted to being upset about Coleman's new relationship with a different woman. Yet, the government denies House was motivated to falsely accuse Coleman, arguing instead that her change of heart about pressing charges suggests the allegations were truthful and would have implicated Coleman. Thus, the government speculates that the hearsay is reliable because House's accusations are likely to be true.

Even so, regardless of the truth of House's out-of-court allegations, the government needed to offer additional indicia of reliability when a possible motive to implicate Coleman indisputably existed. *See id.* (considering other indicia, besides motive to implicate a defendant, as part of *Bell*'s reliability analysis). Here, the government offered no additional indicia of reliability. We note that the record shows several untested paths to gather corroborating evidence supporting reliability. Thus, by failing to test those paths, we conclude the government failed to meet its burden of reliability under the second *Bell* prong.

## C. Harmless Error

"To find harmlessness the [g]overnment must 'present[] sufficient evidence, *apart from the hearsay statements*, to prove by a preponderance of the evidence that [the defendant] violated the conditions' of his supervision." *Timmons*, 950 F.3d at 1051–52 (alterations in original) (emphasis added) (quoting *Black Bear*, 542 F.3d at 256).

In *Timmons*, we concluded that the district court harmfully erred when it denied the defendant his confrontation rights. The alleged victim's statement was "the only evidence connecting [the defendant] to her injury." *Id.* at 1052. The *Timmons* district court found the hearsay evidence there was reliable where the declarant made her oral, unsworn statements to the police, after a 911 hang-up call, and no evidence indicated that the hearsay declarant had a motive to lie. *Id.* at 1051. But we disagreed and viewed the corroborating evidence as unreliable because the declarant had an adversarial relationship with the defendant. *Id.* Thus, but for those statements, "the district court could not have found [the defendant's] state law violations proved by a preponderance of the evidence." *Id.* at 1052.

Here, the government rests entirely on House's photographs to corroborate House's unsworn statements. But the photographs do not show how the injuries occurred, who inflicted them, or when. Like *Timmons*, without the hearsay, the district court would not have been able to find that Coleman assaulted House by a preponderance of the evidence. Thus, the district court's error was not harmless.

## D. Record on Remand

Coleman asks us to remand without expanding the record. "[T]hat remedy is appropriate 'where the government knew of its obligation to present evidence and failed to do so.'" *Id.* (quoting *United States v. Dawn*, 685 F.3d 790, 798 (8th Cir. 2012)). Under *Bell*, the government knew it needed to show good cause for denying Coleman's Sixth Amendment right to confront House. For that reason, *the*

*government* notified the district court and defense counsel that "the *Bell* test would have to be a factor" in the hearing. The government even voiced its expectation that Coleman would raise an objection based on the *Bell* test. Knowing it had to meet *Bell* while failing to do so bars the government from expanding the record on remand. *Johnson*, 710 F.3d at 790. Thus, we grant Coleman's request to remand without expanding the record.

## III. Conclusion

We reverse the judgment, vacate the revocation sentence, and remand for a revocation hearing consistent with this opinion.

KOBES, Circuit Judge, dissenting.

Because I think that the Government showed that the victim's testimony was practically unavailable, I would affirm. To secure her testimony at Coleman's revocation hearing, both Werning and Cann called House over the course of several weeks. Werning tried to subpoena House at her home, but it was padlocked and abandoned. Werning later connected with House, who said she was homeless. They planned to meet later that day, but House never showed. Both Werning and Cann continued to contact her, but she told Cann she was "moving out of town." After House's phone was disconnected and officers had no way to contact her, Werning and Cann gave up. Despite these efforts, the Court concludes that the Government did not meet its burden under *United States v. Bell*, 785 F.2d 640, 643 (8th Cir. 1986). I disagree and respectfully dissent.

This case is different from *Timmons* and *Sutton*, where we found that one or two failed attempts to subpoena a witness was insufficient. *See United States v. Timmons*, 950 F.3d 1047, 1050 (8th Cir. 2020) (Kobes, J.); *United States v. Sutton*, 916 F.3d 1134, 1139 (8th Cir. 2019). Here, both Werning and Cann followed up with House several times. House told Werning she was homeless and was living "wherever." House also told Cann she was "moving out of town." As the hearing

-11-

approached, both Werning and Cann called House repeatedly, but her phone was "no longer in use." Unlike *Timmons* and *Sutton*, Werning and Cann continuously connected—or attempted to connect—with House to secure her testimony and/or serve her a subpoena. House did not tell anyone where she was moving or how to get in contact with her. After her phone was disconnected, Werning and Cann had no way to reach her. I would find that these facts show that getting House's testimony was "undesirable or impractical" under *Bell*.

I would also find that the testimony was sufficiently reliable. House recounted the details of her assault consistently to three different law enforcement officers on different occasions and had photographs documenting her injuries. Unlike the witnesses in *Sutton*, the details of House's account remained the same each time she recounted it to Werning, Molginicki, and Cann. *See Sutton*, 916 F.3d at 1140 ("All three witnesses were at times admittedly untruthful, . . . internally inconsistent . . . and demonstrated motives to minimize their own involvement in the assault."). Photographs of House's injuries, taken by Officer Molginicki two days after the alleged assault, also corroborate her account of what happened. House told Werning that Coleman had bitten her face, broken her teeth, and choked her. The photographs Molginicki took—which were admitted at the revocation hearing— show House with chipped teeth, a black eye and a bite mark, and finger marks on her throat. While "unsworn and oral statements to the police are the least reliable type of hearsay," they "may nevertheless be reliable if corroborated by other evidence." *Timmons*, 950 F.3d at 1051 (citation omitted). The photographs support the reliability of the testimony proffered at Coleman's revocation hearing. I would affirm the judgment of the district court.

_____