# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-2957
_____

United States of America,

*Plaintiff - Appellee,*

v.

Elmarries L. Harris,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: March 11, 2024
Filed: August 15, 2024

_____

Before COLLOTON, Chief Judge, ERICKSON and KOBES, Circuit Judges.

_____

COLLOTON, Chief Judge.

Elmarries Harris appeals a judgment revoking his term of supervised release. He argues that the district court denied him the right to confront witnesses against him at his revocation hearing. We conclude that the judgment of the district court[1] is consistent with the applicable rule of criminal procedure and the requirements of due process, so we affirm.

I.

Harris was serving a term of supervised release in 2023 after finishing a prison sentence for a firearms offense. In January 2023, the probation office reported to the district court that Harris committed several violations of the conditions of his release. The most serious allegation was that Harris assaulted his wife, Erica, at an apartment in Springfield, Missouri.

In June 2023, the court held a revocation hearing. Harris denied the allegations, and the government presented only the violation report from the probation office and a defense investigator's report that Erica denied being assaulted. Harris objected that the evidence was hearsay. The court continued the hearing for sixty days to receive additional evidence. In the meantime, the probation office submitted another violation report alleging that Harris consumed alcohol.

At a reconvened hearing in August, the government submitted evidence about the alleged assault of Erica. The prosecution presented medical records of Erica's injury. The government served a subpoena on Erica, but she refused to appear.

---

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

A police officer testified that a friend of Erica's named Amy Jones called 911 on January 21, 2023. Jones reported that she had just completed a video call with Erica during which Erica had swollen eyes, was unable to speak well, and told Jones that she had just awakened from being knocked out. Harris objected to this testimony as hearsay.

The police officer explained that he responded to the 911 call by visiting Erica's residence and made contact with a neighbor named Janet Breaux. Breaux told the officer that Erica had come to Breaux's door, asked for help, and said that she and her husband got into a fight. Breaux said that "he beat the hell out of her." The officer's conversation with Breaux was recorded on a police officer's body camera, and the video was received in evidence to eliminate a second layer of hearsay. Harris objected to the officer's testimony about what Erica told Breaux and to the body camera video.

The officer further testified that he located Erica at the scene and found that she needed assistance to stand. Her entire face was swollen, and she could barely open her eyes due to the swelling. After observing Erica's injuries, the officer called for emergency medical services. Before Erica was transported to the hospital, she asked the officer to help contact her landlord to request a change of her apartment's locks.

After Erica left in the ambulance, the officer contacted Jones by telephone. The officer's body camera video recorded the call, and the government played the video at the hearing over Harris's objection. Jones said that Erica told her that Erica's husband had "beat her up really bad."

The probation officer also testified at the reconvened hearing. She explained that two days after the incident, she made contact with Erica's sister, Jessica Hempstead, at Erica's apartment. The sister told the probation officer that this incident was not the first domestic assault that had occurred between Harris and

-3-

Erica. The sister then telephoned Erica's mother, Billie Newsome. The mother told the probation officer by telephone that the January incident was not the first time that Harris had assaulted Erica, and that the mother believed that Harris would kill Erica. Harris objected to the probation officer's testimony about the statements of Erica's sister and mother.

At the conclusion of the hearing, the district court found that Harris committed a Grade A violation of his conditions of release by committing a domestic assault in the second degree. The court cited images of Erica's injuries and medical records that were "consistent with multiple striking or assault or blunt force trauma to different planes or angles on her face." The court found that "some of the significant aspects of the government's evidence" were the police officer's report of the 911 call by Jones reporting that Erica had just awakened after being knocked out, the officer's testimony about neighbor Breaux's account that Erica said she had been assaulted by Harris, and the officer's testimony that Erica's immediate concern after the assault was to have the locks changed at her apartment.

The court also found that Harris violated other conditions of his supervised release: failing to answer the probation officer's questions truthfully and to follow her instructions, failing to notify the probation officer ten days before changing his residence, and consuming alcohol.

The court sentenced Harris to the statutory maximum sentence of 24 months' imprisonment with no supervised release to follow. *See* 18 U.S.C. § 3583(e)(3); USSG § 7B1.4(b)(1). But for the statutory maximum, the court would have imposed a longer term of imprisonment "because of the multitude of violations and the seriousness of the violations."

II.

On appeal, Harris argues that the court's reliance on hearsay evidence violated Federal Rule of Criminal Procedure 32.1 and deprived him of liberty without due process of law. Rule 32.1(b)(2)(C) explains that a defendant is entitled to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." The Confrontation Clause of the Sixth Amendment does not apply at a revocation proceeding, but a defendant has a "limited due process right" to confront adverse witnesses. *United States v. Ray*, 530 F.3d 666, 668 (8th Cir. 2008). The court "must balance the [defendant's] right to confront a witness against the grounds asserted by the government for not requiring confrontation." *United States v. Bell*, 785 F.2d 640, 642 (8th Cir. 1986). This balancing process requires the court to assess the government's explanation for why confrontation is undesirable or impractical and to consider the reliability of the evidence that the government offers in place of live testimony. *Id.* at 642-43.

> [W]here the government demonstrates that the burden of producing live testimony would be inordinate and offers in its place hearsay evidence that is demonstrably reliable, it has made a strong showing of good cause. Where, on the other hand, the government neither shows that presenting live testimony would be unreasonably burdensome nor offers hearsay evidence that bears indicia of reliability, the [defendant] is entitled to confrontation.

*Id.* at 643. Other cases fall between these two poles and require a judgment under the balancing process described in *Bell*.

We conclude that the district court did not err in deciding that the proceedings comported with due process and that the interest of justice did not require Erica, Jones, and Breaux to appear. Erica was a victim of a violent assault, and she refused to appear while under subpoena. There is good cause for not producing a declarant

-5-

like her where a defendant has a history of violent conduct that makes reprisal a possibility. *See United States v. Simms*, 757 F.3d 728, 733 (8th Cir. 2014); *United States v. Martin*, 382 F.3d 840, 846 (8th Cir. 2004). The government subpoenaed Breaux, Erica's neighbor, but Breaux did not appear. The prosecution presented evidence that Breaux sustained significant injuries in a recent automobile accident and was unable to travel from Springfield to Kansas City for the hearing.[2] The government attempted to serve a subpoena at the address that Jones, the 911 caller, had provided to law enforcement, but Jones did not then reside at the address. The government also attempted to reach Jones at telephone numbers that she had provided to law enforcement, but the cell phone numbers had been disconnected and no one answered the landline number. This case is distinguishable from *United States v. Timmons*, 950 F.3d 1047, 1050 (8th Cir. 2020), where the government made only a single failed attempt to serve a witness who lived at an address known to the government, and *United States v. Sutton*, 916 F.3d 1134, 1139 (8th Cir. 2019), where the government made no attempt to subpoena one witness, no attempt to contact a second witness at the address and telephone number that he provided to police, and only one attempt to subpoena a third witness at a known address.

The evidence that Harris assaulted Erica bears indicia of reliability. There was convincing medical evidence that Erica had been assaulted. Jones, the 911 caller, and Breaux, the neighbor, independently told police that Erica identified Harris as her attacker. Erica's statements to both declarants came in the recent aftermath of the assault and typically would qualify as reliable statements of present sense impression or excited utterance. *See* Fed. R. Evid. 803(1)-(2); *United States v. Dean*, 823 F.3d

---

[2]At the hearing on Friday, August 25, the prosecutor stated that Breaux "had a car accident on Friday," suggesting the previous Friday, August 18. The evidence was not that precise, but it shows that the accident was recent. The probation officer testified that she spoke with Breaux on August 8, that Breaux "indicated she initially could attend on that day," but "then she had been in an automotive accident," and "she would no longer be available."

422, 427-28 (8th Cir. 2016) (per curiam); *United States v. Graves*, 756 F.3d 602, 605-06 (8th Cir. 2014). The statements were made "while the event was fresh in her memory and before she had an opportunity to recant as not infrequently done by victims of domestic abuse." *United States v. Farmer*, 567 F.3d 343, 347 (8th Cir. 2009). Erica did not directly identify her assailant to police when they arrived, but she spontaneously asked for help to change the locks on her apartment—a request that naturally points to Harris as a spouse with a key. All of these statements corroborate each other and provide another indicium of reliability through their consistency. *See United States v. Sheridan*, 859 F.3d 579, 583 (8th Cir. 2017) ("In reviewing the reliability of hearsay and double hearsay evidence, we have considered factors such as the consistency of the hearsay testimony, the timing and nature of the declarant's statements, and the witness's impressions of the declarant's demeanor, as well as other corroborating evidence.").

Rule 32.1 and due process considerations require a balancing process when determining whether a court may rely on out-of-court statements to support a revocation. Our decision in *Bell* posited the easier cases for allowing and disallowing a decision based on hearsay evidence, but many cases fall in a gray area. This is not a clear case for requiring confrontation where the government showed neither an unreasonable burden to present live testimony nor indicia of reliability for the hearsay evidence. *See Bell*, 785 F.2d at 643. On the other end of the spectrum, this is not a clear case for allowing a decision based on hearsay testimony after a "strong showing" of good cause. *Id.*

But not every showing of good cause must be a "strong" showing of good cause. We conclude that the government here provided reasonably satisfactory explanations for the absence of witnesses—a victim of assault who reasonably could have feared reprisal, a witness who recently sustained significant injuries in a car accident, and a witness who could not be found at the address or telephone numbers that she provided to police after the incident. The hearsay statements in which Erica

-7-

identified her assailant corroborated each other, and the timing of Erica's statements in the wake of the assault indicated reliability.  We are satisfied overall that the district court's determination is consistent with the interest of justice and the guarantee of due process.

The judgment of the district court is affirmed.

_____