**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-4636**

───────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GERALD ADRIAN WHEELER, a/k/a Bay-Bay,

Defendant - Appellant.

───────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:06-cr-00363-RJC-3)

───────────

Argued:  January 29, 2025                    Decided:  March 10, 2025

───────────

Before KING and THACKER, Circuit Judges, and FLOYD, Senior Circuit Judge.

───────────

Vacated and remanded by published opinion.  Judge Thacker wrote the opinion, in which Judge Floyd concurred.  Judge King wrote a dissenting opinion.

───────────

**ARGUED:**  Ann Loraine Hester, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Julia Kay Wood, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  John G. Baker, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

───────────

1

THACKER, Circuit Judge:

Gerald Wheeler ("Appellant") appeals the district court's order revoking his supervised release and sentencing him to six months of imprisonment followed by an additional year of supervised release. Appellant argues that the district court abused its discretion when it admitted hearsay evidence during his revocation hearing, and that the improper hearsay evidence was essential to the district court's finding that he violated his supervised release. We agree.

I.

A.

The Revocation Petition

Appellant was convicted in 2007 of various drug and firearm offenses and was sentenced in March 2008 to 180 months of imprisonment. In 2018, we granted Appellant post-conviction relief when we vacated one of his convictions and remanded to the district court for resentencing. *See United States v. Wheeler*, 886 F.3d 415, 419 (4th Cir. 2018). On remand, the district court imposed a sentence of time served and imposed a four year term of supervised release, which Appellant began serving on March 1, 2019.

On January 27, 2023, just over a month before Appellant's supervised release was set to end, his probation officer filed a petition to modify Appellant's conditions of supervision because Appellant had been charged in state court with felony assault by strangulation and misdemeanor assault on a female. However, the district court ordered the probation officer to initiate supervised release revocation proceedings instead.

2

As a result, on February 1, 2023, the probation officer filed a Petition for Warrant for Offender Under Supervision (the "Revocation Petition"). The Revocation Petition alleged two violations. Violation number one alleged, "On or about December 24, 2022, [Appellant] unlawfully and feloniously assaulted Nyasia Mobley inflicting physical injury by placing both hands around her neck and squeezing for approximately 30 seconds," and that Appellant was charged with Felony Assault by Strangulation, in violation of North Carolina General Statute § 14- 32.4(B). J.A. 309.[1] The Revocation Petition identified violation number one as a Grade A violation. Violation number two, which the Revocation Petition identified as a Grade C violation, alleged, "On or about December 24, 2022, [Appellant] unlawfully assaulted Nyasia Mobley by striking her in the face with a closed fist." *Id.* It alleged that Appellant had been charged with misdemeanor assault on a female in violation of N.C. Gen. Stat. § 14-33(C)(2).

After a preliminary hearing on April 6, 2023, a United States Magistrate Judge determined there was not probable cause as to alleged violation number one. The magistrate judge found probable cause for alleged violation number two but permitted Appellant to remain on bond pending the final revocation hearing.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

B.

The Revocation Hearing

The district court held the revocation hearing as to alleged violation number two, misdemeanor assault on a female, on September 19, 2023. Appellant disputed the alleged violation.

Before presenting evidence, the Government informed the court that Mobley, the alleged victim, was not present for the hearing. The Government explained that it made efforts to subpoena Mobley, but she did not make herself "available for service of that subpoena despite great efforts by the probation officer in this case." J.A. 167. The court inquired about the probation officer's efforts. The probation officer responded that after receiving the subpoena at the end of August, he had tried to contact Mobley via text messages and phone calls, but he generally received no response. When Mobley would respond and indicate a willingness to meet, she would not set any definite time or location for the meeting. The probation officer also told the court that Mobley had been out of town twice during the time he had been trying to serve the subpoena. The probation officer went to Mobley's known residence one time -- just days before the hearing -- to attempt to serve the subpoena, but Mobley was not home. The district court questioned whether the Government would be able to serve the subpoena if it had more time. The probation officer responded that he "could try" and "maybe just position myself at the residence and wait for her to arrive in order to serve her the subpoena. That's probably the only option that I have at this point." *Id.* at 172.

4

Appellant objected to a continuance and to the introduction of hearsay evidence of Mobley's statements.  He argued that he had an "extremely heavy" interest in cross examination.  J.A. 170.  Regarding the reliability of Mobley's statements, Appellant pointed out that Mobley "has lied to probation on at least once [sic], certainly has recanted this story at least once.  There are indications in the story itself that are internally inconsistent." *Id.*  Therefore, Appellant argued that the balancing test weighed in favor of excluding Mobley's hearsay statements.  For its part, the Government recognized that "given the nature of these alleged violations and the defendant's position with respect to what happened, and the alleged victim's conduct and her subsequent statements to the probation officer, I think there probably is a question of whether or not the victim was being truthful." *Id.* at 168.  And the Government admitted that Mobley recanted her story when first interviewed by the probation officer and then "has flip flopped back and forth since that time." *Id.*  But the Government did not take a position with respect to a continuance, suggesting that it could go forward with the revocation hearing with the witnesses that it did have available.

In light of that, the district court determined that the hearing would move forward. The court "recognize[d] [Appellant's] strong interest in confrontation," but explained that it would "make a reliability assessment after I've heard the evidence." *Id.* at 174.  The court explained that if it "finds that the statements that are alleged to be hearsay are reliable, I'll consider them. If I find that they're not reliable, I'll exclude them.  But I think I have to hear them first before making that decision." *Id.*

5

The Government presented four witnesses in support of alleged violation number two: Howard Sampson, an employee at the hotel where the alleged assault took place; probation officer Wzorek; and the police officers who responded to Mobley's 911 call, Officers Shanks and Flores of the Charlotte Mecklenburg Police Department.

1.

Howard Sampson

Sampson did not testify to any hearsay statements made by Mobley, but he offered his version of events as the employee behind the front desk at the Drury Inn where the events of December 24, 2022 took place. According to Sampson, four people came into the hotel -- two men and two women. One of the women, Mobley, tried to check into a hotel room using a credit card authorization form, but the credit card on the form was declined. Sampson remembered that Mobley had tried to do the same thing a month earlier, and he told the group he would not check them into the hotel because he believed Mobley was trying to pull off a scam.

Mobley offered to pay for a room in cash, but Sampson informed her that she would still need a credit card on file to authorize a $50 hold for incidentals. She did not have a credit card, but one of the men, Appellant, initially offered to let her use his credit card for the incidental hold. However, Sampson recalled that Appellant quickly changed his mind and he and Mobley started arguing.

6

Sampson explained that he went to the back office for "maybe two or three minutes"[2] hoping they would leave, but he "heard something that sounded more like furniture moving or something like that" and went back to the front desk. J.A. 176. When Sampson returned, he observed that Appellant "was a little roughed up. He looked to me like he had been in a fight, something like that. And the two women were screaming and hollering at him." *Id.* Appellant "was screaming back at them," but Appellant walked to the door and left. *Id.*

Sampson testified that Mobley called the police, and they arrived at the hotel 10 to 15 minutes after Appellant left. According to Sampson, the police did not want to speak to him at first, but he told the officers he wanted the women out of the hotel because of the fighting and because they broke a lamp during the altercation with Appellant. Pursuant to hotel policy, Sampson prepared a hotel incident report that night recounting this version of events.

On cross examination, Sampson testified that Appellant did not use his credit card for the incidental hold because he thought Mobley was also trying to scam him. Sampson testified that Mobley then got "very angry" with Appellant. J.A. 182. He also testified that he heard the two arguing when he went to the back, but he never heard screaming. Finally, Sampson testified that as Appellant was walking to the exit, Appellant was screaming that

---

[2] On cross examination, Sampson said it may have been "maybe like three to five minutes. Nothing longer than that I don't think." J.A. 182.

Mobley was trying to scam the hotel, and that after Appellant left, he "called on the phone, the hotel phone, and said they was trying to scam me." *Id.* at 184.

2.

Probation Officer Wzorek

The Government next called probation officer Wzorek to the stand. Wzorek testified that he went to Appellant's home to meet with him on January 19, 2023, about a month after the incident. When Wzorek arrived, Mobley was at Appellant's home with him. Appellant admitted to Wzorek that he and Mobley had gotten into an argument at the hotel, but he denied "plac[ing] hands on her." J.A. 189. Wzorek asked to speak with Mobley privately and Appellant left the room. Wzorek testified that he asked Mobley "direct questions" such as, "Did he place hands on her and she said no. I asked if she felt threatened and she said no. Her statement was basically to -- she wanted this dismissed and to move on." *Id.*

Wzorek also testified that Mobley called him in July and "said that she did alter her initial story when I met with her in January. She mentioned that she came in agreement with Mr. Wheeler and the agreement was that he would never place hands on her again and he would provide for her." J.A. 192. But she said that some "threats continued and he reported to her employment and also spat on her." *Id.* at 193.

Finally, the Government returned to Wzorek's efforts to serve Mobley the subpoena:

> A few text messages to try to meet with her to discuss this case and serve a subpoena. Probably only one or two times

8

> telephone calls and tried to meet up with her. Both times she would mention that she was out of state.
>
> She did send me a text message a few days ago that she was in Washington D.C. and did a snapshot of her location and wouldn't be back until later that night. That's the last time I've heard from her.

J.A. 193.

On cross examination, Appellant's counsel confirmed that Wzorek had not had any issues with Appellant during his four years of supervision other than this incident. He also asked about whether Wzorek tried to contact Mobley's cousin who was the other woman present during the hotel incident. Wzorek responded that he had called her, but she hung up when he identified himself. Appellant's counsel also confirmed that when Wzorek first interviewed Mobley, she told him she did not call the police on December 24, but that was not true. Appellant's counsel asked Wzorek to confirm that Mobley "lied to you personally multiple times," and Wzorek responded, "She has." J.A. 199.

Finally, Appellant's counsel asked Wzorek to confirm that in June 2022, Appellant had informed him that Mobley had pressed charges against Appellant for stealing her license plate, but that Appellant claimed the charge was false and the charge was dismissed in July 2022. Wzorek confirmed that was all correct. After the Government's brief redirect examination, the court asked Wzorek whether it was correct that Mobley had recanted her recantation. Wzorek confirmed that was correct and informed the court that Mobley did not provide any details of what she claims occurred during the incident.

9

3.

Officer Shanks

The Government's third witness was Officer Shanks, one of the officers who responded to the Drury Inn after Mobley called the police on December 24, 2022. Officer Shanks testified that Mobley told him she had "various altercations where her and [Appellant] had got into an argument early in the night. She stated that she wanted to have -- stay at the hotel that night and she -- him and her got into an argument and [Appellant] had assaulted her." J.A. 203. Officer Shanks testified that Mobley told him that Appellant "had punched her in the face as well as choked her." *Id.* at 204.

When asked about whether he observed injuries to Mobley, Officer Shanks testified that he "observed a small cut to the bottom right of her lip" as well as "slight redness to her neck." J.A. 204. Mobley told Officer Shanks that she had tried to cover up the redness on her neck, but he was not sure if she meant she tried to cover it with her jacket or used makeup.

During its direct examination, the Government introduced the video from Officer Shanks' body worn camera. But when the video started playing, Appellant's counsel noted that he could not hear the audio. The Government responded that was "the best I can do on the audio," but told defense counsel, "If you have better audio, that's fine." J.A. 205–06. Defense counsel confirmed that the audio on his copy was better, and the court responded, "Let's mark this as Defense 1 and play it." *Id.* at 206.

The Government asked Officer Shanks about a Strangulation Case Evaluation form he completed at the scene while speaking with Mobley. The Government noted that there

10

were check boxes on the form for the officer to mark based on the victim's description and the officer's observation of the listed sign or symptom of strangulation. Officer Shanks had not checked any of the boxes in those sections, including one that asked whether there was redness to the neck. Officer Shanks explained that he "was skimming through that paragraph fairly quickly as well as trying to get through this long portion that usually the victim does not want to list, although I should have checked that." J.A. 213.

Finally, Officer Shanks testified on direct examination that he did not see anything in Mobley's demeanor that caused him to question whether her statement was true or false. He also said that he had wanted to speak with the cousin at the scene but "she was not completely cooperative and Ms. Mobley didn't want her to speak to officers as much." J.A. 213.

On cross examination, Appellant questioned Officer Shanks about the inconsistency in his reports regarding any redness on Mobley's neck or signs of bleeding from her lip. Defense counsel played a segment of Shanks' body worn camera video, which the court had marked Defense Exhibit 1, in which Officer Shanks was asking Mobley if she had the various signs and symptoms listed in the strangulation form. Officer Shanks asked Mobley whether she had any trouble breathing or swallowing. However, defense counsel pointed out that Officer Shanks failed to ask Mobley about any redness on her neck, and instead stated, based on observation, that she did not have any redness on the neck. Mobley indicated that statement was correct by shaking her head.

Defense counsel also introduced Defense Exhibits 2, 3, and 4, each of which were body worn camera recordings from Officer Flores, Officer Shanks' partner who also

11

responded to the Drury Inn. After playing various clips from the recordings, defense counsel asked Officer Shanks to observe the demeanor of the other man and woman (Mobley's cousin) who were with Mobley at the hotel. The two were standing in the corner behind Mobley and were visible in the video while Officer Shanks questioned Mobley. Defense counsel pointed out that the male had said "holy shit," and that he and the cousin had laughed when Mobley told Officer Shanks Appellant had strangled her. J.A. 221. And he noted that in another video clip, Mobley and her cousin can be seen in the background laughing while Mobley pretends to strangle the cousin. Officer Shanks testified that it was not normal in his training and experience for victims to joke about being strangled or grab others by the throat to mock the experience. Finally, defense counsel asked Officer Shanks if he heard correctly in Defense Exhibit 4 that Mobley told Officer Shanks that when Appellant left "he was on his phone telling someone to come, quote, drag that bitch." *Id.* at 225. Officer Shanks confirmed that was correct.

4.

Officer Flores

Finally, the Government called Officer Flores to the stand. Officer Flores testified regarding Mobley's demeanor:

> I wouldn't find anything strange. I know a lot of victims for domestic violence have a wide variety of ways that they express themselves. She kind of was expressing that she had gotten injured. I could see that she cared and she was passionate about calling us and talking about the incident that happened. She felt very, I guess I could say, excitable when she was speaking about it, about what happened, because it was kind of recent that it had happened to her.

12

> I know a lot of people -- like I said, some people are devastated. Some people, you know, had very -- reactions are not normal to see outside from what we do every day.

J.A. 232.

On redirect examination, defense counsel questioned Officer Flores about whether he remembered Mobley's cousin telling him that as Appellant left the hotel, he "was on the phone and shouted something to the effect of, come drag this bitch." J.A. 234. Officer Flores responded, "Yes." *Id.*

## C.

## The District Court's Ruling

Immediately after the Government rested, the court asked if either side wished to be heard. The Government responded, "Yes, your honor. Putting aside the hearsay issue, your Honor, which." J.A. 236. But the district court interjected with the following holding:

> THE COURT: Let me – I've heard you both on that issue. This is a supervised release hearing. The Court must balance Mr. Wheeler's interest in confronting an adverse witness against any proffered good cause for denying such confrontation.
>
> Doing that balancing, I do believe that the Government has shown great effort at trying to secure the witness for purposes of this testimony and I don't find any good cause not to consider this hearsay testimony from Ms. Mobley.
>
> I do think that the presence of the body-worn cameras, the police reports and other documentation of events right after they occurred are -- enable Mr. Wheeler to engage in cross-examination of the officers. Of course, it would have been most preferable if Ms. Mobley was here subject to cross-examination as well, but I find the hearsay testimony meets that balancing test.

I find that for a variety of reasons. It's reliable. The witness appeared to have a calm demeanor. She gave the statement immediately after the event in question. She called police to report the incident immediately afterward. Any false statement has a possibility of subjecting her to prosecution for false reports. And I find that the testimony is largely consistent with the injuries observed by two different officers. Largely consistent with a signed statement Ms. Mobley made immediately after the oral statement. And so I think the objections to it would go more to weight than admissibility.

So because I find the statements reliable, because I have found that the Government has met the balancing test of Rule 32.1, I will admit the testimony of -- hearsay testimony of Ms. Mobley.

*Id.* at 236–37.

The Government argued that even without the hearsay testimony it believed there was sufficient evidence of the assault because (1) it was undisputed that an incident occurred; (2) while Sampson did not witness it, he heard the sounds of an argument and what he described as the movement of furniture; and (3) the officers testified that Mobley had physical injury to her lip and redness to her neck.

Appellant recognized the court had ruled but renewed his objection.[3] Appellant pointed out multiple inconsistencies between Sampson's statement and Mobley's statements to police, such as (1) Sampson testified that he did not hear Mobley screaming like she claimed; (2) Sampson observed that Mobley appeared as the aggressor and Appellant appeared to be roughed up; and (3) Sampson testified that he saw Appellant

---

[3] Of note, Appellant renewed his objection to Mobley's hearsay statements throughout the hearing, but the court stated each time that it would conditionally admit the evidence and decide later whether it was admissible.

14

leave and Appellant was not on the phone as Mobley claimed but was instead yelling that Mobley was trying to scam him. Appellant argued that the only evidence that supported that Appellant caused any physical injury to Mobley was the hearsay statements from Mobley herself. He again focused on Mobley's demeanor in the videos, including how she was laughing and joking with her cousin when not talking to the officers. Appellant also pointed out the inconsistency in the report regarding redness on Mobley's neck, and that the video did not show any sign of a bloody lip or neck redness. In the end, Appellant argued that Mobley was not credible and that there was not enough evidence to support a finding by a preponderance that Appellant had assaulted her.

The court heard the argument and responded that it believed the officers were credible in their testimony that Mobley had a cut lip and redness on her neck. The court recognized, "this is close case," but it nonetheless believed "the Government has a better – of the argument that even without the hearsay testimony, that the Government has met its burden by a preponderance of the evidence." J.A. 245. The court explained, "the Government must show an assault on a female by a male person who's at least 18 years of age. I think the evidence in this case shows that." *Id.* The court did not credit Sampson's assessment that Mobley appeared to be the aggressor because Sampson was not present during the physical violence and, in the court's view, it appeared from the rest of the testimony that Appellant was actually the aggressor. The court believed the officers corroborated Mobley's statement when they testified that they observed the cut lip and redness to her neck because those injuries are "rather indicative of an assault on the person." *Id.*

15

While the court stated that Mobley's recantation and re-recantation "tend to reflect negatively on [Mobley]," it held that "at the end of the day, the statements which were made, both in oral and written form and corroborated by the observations of two law enforcement officers" were sufficient to find "by a preponderance of the evidence that the assault occurred" and "that violation No. 2 has been established." J.A. 247.

After finding the violation, the court sentenced Appellant to six months of imprisonment followed by an additional year of supervised release. But the court permitted Appellant to remain on bond pending appeal, noting again that "this was a close case[,] and Mr. Wheeler should have an opportunity too for his case to be heard" on appeal. J.A. 263.

Appellant timely filed this appeal.

## II.

"[W]e review a district court's evidentiary decisions in a supervised release revocation hearing for abuse of discretion." *United States v. Combs*, 36 F.4th 502, 505 (4th Cir. 2022) (citing *United States v. Doswell*, 670 F.3d 526, 529 (4th Cir. 2012)). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on [clearly] erroneous factual or legal premises, or commits an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007); *see Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013) ("A district court abuses its discretion by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." (citation and internal quotation marks omitted)).

16

Even if the district court erred, we need not vacate its judgment if the error was harmless. *See United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014). And error is harmless if it "had no substantial and injurious effect or influence on the outcome." *Id.* (internal quotation marks omitted).

## III.

Appellant argues on appeal that the district court erred when it admitted and relied on Mobley's hearsay statements to find that the violation occurred. Appellant alleges the district court failed to properly conduct the required balancing test for the admission of such testimony, and he argues the court clearly erred in concluding both that Mobley was reliable and that the Government had offered a satisfactory explanation for not producing Mobley for live testimony. In response, the Government argues that the court did not err, and that if it did, any error was harmless because there was sufficient evidence, without the hearsay to prove the violation.

## A.

### 1.

"Supervised release revocation hearings are informal proceedings in which the rules of evidence, including those pertaining to hearsay, need not be strictly applied." *United States v. Doswell*, 670 F.3d 526, 530 (4th Cir. 2012) (citations omitted). But, of significance here, the Supreme Court has held that a person facing revocation of release possesses a due process "right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972). Federal Rule of Criminal Procedure 32.1 "sets forth

17

the parameters of this limited right." *Doswell*, 670 F.3d at 530. That rule provides that a defendant in a revocation proceeding "is entitled to . . . an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2).

In *Doswell*, we held that "prior to admitting hearsay evidence in a revocation hearing, the district court must balance the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation." 670 F.3d at 530. We explained that the district court must determine whether the "hearsay evidence is reliable *and* [whether] the Government has offered a satisfactory explanation for not producing the adverse witness." *Id.* at 531 (emphasis supplied). In other words, the Government must establish the reliability of the declarant *and* also provide a sufficient explanation for not producing the declarant in court. If the court concludes that the Government has satisfied both inquiries, "the hearsay evidence will likely be admissible under Rule 32.1." *Id.* "On the other hand, hearsay evidence of questionable reliability will of course provide a far less firm basis for denying a releasee the opportunity to 'question any adverse witness.'" *Id.* (quoting Fed. R. Crim. P. 32.1(b)(2)(C)). Importantly, while "the reliability of the evidence is a critical factor in the balancing test," even reliable hearsay evidence is nonetheless inadmissible "unless the government makes a showing of good cause for why the relevant witness is unavailable." *United States v. Ferguson*, 752 F.3d 613, 617 (4th Cir. 2014) (cleaned up).

18

2.

a.

Appellant first argues that the district court abused its discretion by misapplying the *Doswell* balancing test. *Doswell* requires that before a court "admit[s] hearsay evidence in a revocation hearing," it "must *balance* the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation." 670 F.3d at 530 (emphasis supplied). The Government bears the burden of establishing good cause for denying the confrontation. *See id.* Appellant argues that the district court abused its discretion in applying this balancing test because it did not properly consider or balance his interest in confrontation at all. We agree.

To be sure, the district court recognized that it was required to conduct a balancing test. In fact, the court stated explicitly that it "must balance Mr. Wheeler's interest in confronting an adverse witness against any proffered good cause for denying such confrontation." J.A. 236. And in announcing its ruling, the district court stated,

> Doing that balancing, I do believe that the Government has shown great effort at trying to secure the witness for purposes of this testimony and I don't find any good cause not to consider this hearsay testimony from Ms. Mobley.

*Id.* But our review of the record compels the conclusion that the district court did not actually consider the strength of Appellant's interest, nor did it conduct any balancing on the record.

The district court's comment at the beginning of the hearing that Appellant had a "strong interest" in confronting Mobley is insufficient to demonstrate that the district court

19

properly considered the strength of Appellant's interest. As one of our sister circuits has explained, "[t]he weight to be given the right to confrontation in a particular case depends on two primary factors: the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proven by the hearsay evidence." *United States v. Comito*, 177 F.3d 1166, 1167–68 (9th Cir. 1999) (citation omitted). Here, the district court did not provide any explanation of how it valued the strength of Appellant's interest in confronting Mobley. Yet, Appellant's interest could not have been stronger. Mobley's hearsay statements were essential to the court's conclusion that Appellant committed violation number two -- the ***only*** evidence that Appellant had assaulted Mobley was her hearsay statement to police.

What is more, even if it were sufficient for the district court to simply recognize Appellant's "strong interest," the court still failed to put any balancing on the record. Of course, the district court analyzed the Government's side of the equation when it determined that the Government had a sufficient explanation for Mobley's absence. But *Doswell* requires more.

*Doswell* does not require *only* reliability and a satisfactory explanation to admit hearsay evidence. Rather, after the Government has satisfied each of those requirements, "the district court *must balance* the releasee's interest in confronting an adverse witness against any proffered good cause for denying such confrontation." *Doswell*, 670 F.3d at 530. True, *Doswell* suggested that if the Government satisfies both inquiries, "the hearsay evidence will likely be admissible under Rule 32.1." 670 F.3d at 531. But, logically, if the factors making up "good cause" were always sufficient to overcome a defendant's

20

interest, then there would be no need for *Doswell* to require balancing. While the district court here said it made its finding by "[d]oing that balancing," J.A. 236, it did not place any balancing analysis on the record. Without more for this court to review, just saying it conducted the balancing does not make it so. Therefore, we make clear today that district courts considering the admission of hearsay evidence in revocation proceedings must balance, on the record, the defendant's interest in confrontation *against* the Government's good cause. Because the district court failed to do so here, it committed legal error and abused its discretion.

b.

Before leaving this issue, we are also compelled to correct another legal error committed by the district court in this case. In announcing its ruling, the district court held that that the Government had provided a sufficient explanation for Mobley's absence and it "[did not] find any good cause *not to consider* this hearsay testimony from Ms. Mobley." J.A. 236. This statement of the law shifted the burden to Appellant to demonstrate good cause to *exclude* the hearsay evidence. That was incorrect. Rule 32.1 begins with a presumption that hearsay evidence is inadmissible. It is the Government that bears to burden of demonstrating reliability and good cause to *admit* the evidence. *See Ferguson*, 752 F.3d at 617 ("[U]nless the government makes a showing of good cause for why the relevant witness is unavailable, hearsay evidence is inadmissible at revocation hearings.").

In sum, we conclude that the district court abused its discretion by failing to properly conduct the balancing test required by *Doswell*, and by improperly shifting the burden to Appellant.

21

3.

Appellant next argues that even if the district court had properly balanced the interests at stake, it still abused its discretion when it determined that Mobley was reliable and that the Government had "offered a satisfactory explanation for not producing the adverse witness." *Doswell*, 670 F.3d at 531. While we are suspect of the district court's reliability finding, particularly given the fact that the Government admitted to the district court it thought "there probably is a question of whether or not the victim was being truthful," J.A. 168, we need not decide whether it abused its discretion on that issue. This is so because we agree with Appellant that the Government did not provide a sufficient explanation for its failure to secure Mobley's presence in court.

Though we have not had occasion to consider what explanations may be sufficient in this context, the Eighth Circuit has done so thoroughly. The Eighth Circuit has concluded that the Government provided sufficient explanations where it would be "unreasonably burdensome" to transport a witness to the judicial forum from another state; a witness is in another state and cannot be found; a witness refuses to testify;[4] or the live testimony would "pose a danger of physical harm to a government informant," among other reasons. *United States v. Sutton*, 916 F.3d 1134, 1139 (8th Cir. 2019) (citations omitted). Notably, "[w]here the witness is located within the same state as the revocation hearing," the Eighth Circuit has held that "procuring live testimony generally does not impose an

---

[4] The fact that witnesses had been "uncooperative," was not sufficient to excuse their presence where the witnesses never "refused to comply with a subpoena or stated that they would do so." *United States v. Sutton*, 916 F.3d 1134, 1140 (8th Cir. 2019)

22

inordinate burden on the government." *Id.* And, important here, the Eighth Circuit has made clear that "[a] single failed attempt to subpoena" a witness is not "a reasonably satisfactory explanation." *United States v. Timmons*, 950 F.3d 1047, 1050 (8th Cir. 2020) (citation and internal quotation marks omitted).

Appellant argues that the Government's explanation with regard to its failure to secure the key witness here was insufficient because the probation officer made no more than a single failed attempt to serve Mobley. While the probation officer testified that the called and sent text messages to Mobley in the weeks leading up to the revocation hearing, he made only a single attempt to visit her known residence to personally serve her. This, despite the fact that probable cause to proceed with the revocation hearing had been found a full five months prior to the revocation hearing and the subpoena had issued approximately three weeks prior to the hearing. Beyond that, the sole attempt to serve the subpoena occurred just days before the hearing. We have little trouble concluding this was an insufficient effort on the Government's part to secure Mobley's live testimony.

The probation officer knew Mobley's address. He could have made more than one attempt, just days before the hearing, to serve her there. Indeed, as the probation officer suggested at the hearing, he could have "position[ed] [him]self at the residence and wait[ed] for her to arrive in order to serve her the subpoena." J.A. 172. But he did not bother to do that. Even more troublesome is that the Government did not avail itself of the expertise of the United States Marshals Service to serve the subpoena. Instead, the Government was apparently satisfied with the probation officer simply texting Mobley for

23

three weeks and making a single failed attempt to actually serve the subpoena. The Government could not have done much less.

Therefore, we readily conclude that the Government failed to provide a sufficient explanation for its failure to obtain Mobley's live testimony at the revocation hearing, particularly given the import of the testimony of the absent witness. The district court abused its discretion in holding otherwise.

B.

We next consider the Government's argument that any error was harmless. We have held that in this context, an error in admitting hearsay evidence can be harmless if "the error had no 'substantial and injurious effect or influence' on the outcome." *Ferguson*, 752 F.3d at 618 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We are mindful that "[b]ecause cross-examination is such a vital tool for the defendant, it is difficult, after the fact, to assess the full harm of a legal error such as the one in this case." *Ferguson*, 752 F.3d at 619.

The Government points to its argument below that there was sufficient evidence to support the violation even without the hearsay evidence. The Government notes that the district court stated that while "this is close case," "the Government has a better -- of the argument in arguing that even without the hearsay testimony, that the Government has met its burden by a preponderance of the evidence of showing that an assault on a female . . . . I think the evidence in this case shows that." J.A. 245. Thus, in the Government's view, the district court ruled that it would have found the violation even without the hearsay. We disagree.

24

The district court suggests that it thought the Government made a good argument. But its explanation went beyond the sole sentence the Government cites. After noting that the evidence demonstrated that there had been an assault on a female, the district court continued:

> The Court is -- has listened carefully to the testimony of Officer Shanks and Flores and both of them are consistent in their testimony that they observed a cut lip with traces of blood and redness on the neck. And those visible signs of injury could not have occurred the way Mr. Wheeler indicated the events of the night occurred where there was just argument. They're rather indicative of an assault on the person resulting in injury to the lip and the neck.
>
> And so the testimony of -- not the testimony, but the statements, both oral and written, of Ms. Mobley are consistent with and corroborate the observations of the officers.

J.A. 245–46.

As the district court made clear, its conclusion that Appellant was the person responsible for any assault on Mobley was based entirely on the hearsay evidence. We have no doubt that the district court could not have found the violation by a preponderance of the evidence absent the hearsay evidence. Without Mobley's statements, there would have been nothing to suggest Appellant assaulted her. The officers could have testified that they were responding to a call about an assault. But beyond that, they would not have any information about what occurred, who did it, or how it happened. Sampson would have testified that Mobley appeared to be the aggressor, but that he did not see any assault. And the officers could have testified that they observed Mobley's cut lip and slight redness. But there would be nothing in that testimony, without Mobley's statements, that would

25

indicate that it was Appellant who assaulted her.  While that scenario might be *possible*, the evidence could not have satisfied the *preponderance* standard.[5]

## IV.

Because the district court abused its discretion in admitting the hearsay evidence and could not have found the violation without that evidence, we vacate the district court's judgment on the revocation of supervised release and remand with instructions for the district court to dismiss the Revocation Petition.

*VACATED AND REMANDED*

---

[5] Perhaps recognizing this, the Government also argues that the district court would have heard the hearsay evidence anyway because Appellant introduced it in his cross examinations of the Government's witnesses.  But because the district court ruled that it needed to hear the evidence before deciding whether to exclude it, Appellant had no choice but to put on a defense that included the hearsay, lest he put on no defense at all.  We conclude that Appellant did not waive or otherwise forego any challenge to the hearsay evidence by including it in his cross examination under these circumstances.  Appellant made his objection repeatedly during the hearing and each time the district court ruled that it was going to conditionally admit the evidence and decide its admissibility later.

KING, Circuit Judge, dissenting:

Because I am fully satisfied that the very able presiding judge did not abuse his broad discretion in making the challenged evidentiary ruling, I would affirm the judgment of the district court. As a result, I respectfully dissent.