**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-4043**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

ANTHONY D. WILLIAMS, a/k/a Ray L. Dixon,

        Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Senior District Judge. (3:21-cr-00269-FDW-DCK-1)

─────────────

Argued:  December 10, 2024                      Decided:  April 7, 2025

─────────────

Before NIEMEYER and HEYTENS, Circuit Judges, and FLOYD, Senior Circuit Judge.

─────────────

Affirmed by published opinion. Judge Heytens wrote the opinion, which Judge Niemeyer and Judge Floyd joined.

─────────────

**ARGUED:** J. Edward Yeager, Jr., Cornelius, North Carolina, for Appellant. Elizabeth M. Greenough, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

─────────────

TOBY HEYTENS, Circuit Judge:

At Anthony Williams' supervised release revocation hearing, the government offered the alleged victim's out-of-court statements to prove that Williams assaulted her. The district court admitted the statements. We affirm. The district court applied the balancing test prescribed by this Court's decisions and did not abuse its discretion in concluding both that the government showed good cause for the witness's absence and that the statements were sufficiently reliable to permit their introduction.

I.

Williams was convicted of two drug offenses in 1999 and has been on supervised release since 2020. In March 2023, a woman Williams had been living with since being released from prison contacted the police. During an in-person interview, the complainant said that, after an argument, Williams grabbed her neck and squeezed so hard and for so long that she urinated. The complainant also reported that Williams slapped her repeatedly, cutting her lip and causing it to bleed.

Officers gathered other evidence as well. The complainant provided pictures of her injuries taken on her cell phone, and a crime scene technician took more photos at the police station. A police officer walked the complainant through the department's "Strangulation Case Evaluation" form, and she reported symptoms consistent with strangulation, including dizziness, trouble breathing and swallowing, a raspy voice, and urination during the strangulation. The officer also observed several signs of strangulation, including redness and bruising on the complainant's neck, scratch marks, and a raspy voice.

Williams' probation officer spoke with the complainant by phone three days after

2

the incident. The complainant provided the same account, telling the probation officer that Williams had gotten angry and strangled her so much that she urinated. The complainant also texted the probation officer the cell phone pictures of her injuries. The probation officer reviewed the metadata and confirmed the photos were taken shortly after the reported incident.

For reasons not apparent in the record, the district court did not hold a revocation hearing until more than eight months later. The complainant was not present. Instead, the government offered testimony from the police officer who interviewed her, bodycam footage of the interview, a written statement the officer took on the complainant's behalf, the completed Strangulation Case Evaluation form, the cell phone photos, and those taken by the crime scene technician.

Williams objected to "any statements that any person who is not here made," both during the officer's testimony and when exhibits were offered. JA 115. The district court allowed the officer to continue but emphasized that "none of" the challenged testimony or objected-to exhibits would be "admitted until we go through the reliability, confrontation, interests of justice." JA 121. The court ordered briefing on those questions and recessed the hearing.

After receiving the briefs, the district court held a second hearing. At that hearing, the probation officer described—again, subject to Williams' objection—her phone call with the complainant about the incident. The probation officer further testified that she viewed the metadata of the cell phone photos showing the complainant's injuries and confirmed the photos were taken immediately after the alleged assault.

3

The probation officer also described her attempts to contact the complainant since their last conversation three days after the incident. The probation officer explained that she "sent [the complainant] text messages," "called her and left a voice mail," and "sent an email to her trying to get in contact with her." JA 179. The probation officer further testified that a police detective called the complainant and left a voicemail. Finally, the probation officer explained that—after the first revocation hearing but before the second one—she visited the house where Williams and the complainant were living at the time of the incident. The complainant was not there. Instead, the probation officer spoke with a man who said he had been living at the house since a few months after the incident but did not know the complainant.

After hearing argument from both sides, the district court ruled the challenged statements were admissible. It noted that this Court "has adopted a balancing test" under which it had to "balance [Williams'] interests in confronting an adverse witness against any proffered good cause for denying such confrontation." JA 190. The district court determined the government presented sufficient evidence of good cause by showing that officers made repeated "efforts to contact the" complainant. JA 192. The court also concluded that "the totality of the evidence" showed the complainant's out-of-court statements were "reliable." JA 191. Finally, the court emphasized that Williams could "and did cross-examine the officer as to [the complainant's] demeanor during the statements as well as information within [Williams'] knowledge that [the complainant] may have admitted during her statements." JA 192. The district court found—by a preponderance of the evidence—that Williams committed the charged violations and ordered him to serve

4

24 months of imprisonment, to be followed by 12 months of supervised release.

Williams appeals, arguing the district court committed reversible error in permitting the government to introduce "hearsay evidence" from the complainant. Williams Br. 13. "We review a district court's evidentiary decisions in a supervised release revocation hearing for abuse of discretion." *United States v. Wheeler*, 130 F.4th 406, 415 (4th Cir. 2025) (alterations and quotation marks removed).

## II.

Criminal defendants are protected by numerous constitutional and statutory rights. During his 1999 trial, Williams enjoyed "a presumption of innocence," the government had to prove his guilt beyond a reasonable doubt, and Williams had a constitutional right "to be confronted with the witnesses against him." *Coffin v. United States*, 156 U.S. 432, 453 (1895) (first quote); U.S. Const. amend VI (second quote); see also *Sullivan v. Louisiana*, 508 U.S. 275, 277–78 (1993). The trial was also governed by the Federal Rules of Evidence, under which "hearsay" (as defined in those rules) "is not admissible" unless a particular exception applies. Fed. R. Evid. 802; see 801(c) (defining hearsay).

Supervised release revocation proceedings are different. As a person on supervised release, Williams no longer enjoyed a presumption of liberty because supervised release necessarily restrains a person's freedom in ways that would be intolerable if done to someone who has not been convicted of a crime. See *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (noting that revocation of parole "deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions"). Williams also no longer enjoyed

"the full panoply of rights due a" criminal defendant. *Id.* In particular, neither "the Sixth Amendment's Confrontation Clause" nor the Federal Rules of Evidence apply to revocation proceedings. *United States v. Ward*, 770 F.3d 1090, 1098 (4th Cir. 2014); see Fed. R. Evid. 1101(d)(3) ("These rules . . . do not apply to . . . proceedings . . . revoking . . . supervised release."). For that reason, courts may admit evidence during revocation proceedings "that would not be admissible in an adversary criminal trial." *Morrissey*, 408 U.S. at 489.

But revocation proceedings are not process-free zones. Williams was still entitled to not be "deprived of . . . liberty . . . without due process of law," U.S. Const. amend. V, which gave him "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)," *Morrissey*, 408 U.S. at 489; see *United States v. Doswell*, 670 F.3d 526, 530 (4th Cir. 2012) (applying *Morrissey* to supervised release revocation proceedings). These protections are reflected in Federal Rule of Criminal Procedure 32.1(b)(2)(C), which states that a person facing revocation must be given "an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."

The Rule 32.1 analysis "begins with a presumption that hearsay evidence is inadmissible" and "require[s]" district courts "to conduct a balancing test" before admitting an out-of-court statement for its truth. *Wheeler*, 130 F.4th at 416–17; accord Fed. R. Crim. P. 32.1 advisory committee's note to 2002 amendment. The court must first consider whether the government has "provid[ed] a sufficient explanation for not producing the declarant" by making at least some "showing of good cause for why the

6

relevant witness is unavailable." *Wheeler*, 130 F.4th at 416 (first quote); *United States v. Ferguson*, 752 F.3d 613, 617 (4th Cir. 2014) (second quote). If the government offers no such explanation, the balance necessarily tips in favor of the releasee's interest in confrontation and the evidence is inadmissible. See *Ferguson*, 752 F.3d at 617 (hearsay statements inadmissible where there "was zero showing of good cause"); *Doswell*, 670 F.3d at 531 (same).

In contrast, a good-cause showing triggers the need to consider the other side of the scale: "the releasee's interest in confronting" the absent adverse witness. *Doswell*, 670 F.3d at 530. Although that interest is always present (which is why hearsay statements are inadmissible absent a showing of good cause), its weight varies based on the circumstances of the case. "[T]he reliability of" the out-of-court statement "is a critical factor" in assessing the strength of the releasee's confrontation interest. *Ferguson*, 752 F.3d at 617 (quotation marks removed). The court should consider various indicia of reliability, including "the detail of the statement," "the declarant's consistent recounting of the statement on different occasions," and "other evidence independently corroborating the statement." *United States v. Franklin*, 51 F.4th 391, 396–97 (1st Cir. 2022). But reliability is not the only relevant factor in assessing the weight of the releasee's confrontation interest. The court must also consider "the importance of the hearsay evidence to the court's ultimate finding and the nature of the facts to be proved by the hearsay evidence." *Wheeler*, 130 F.4th at 417 (quotation marks removed).

## III.

The district court did not abuse its discretion in admitting the complainant's

7

statements. The court first acknowledged it had to "balance" Williams' "interests in confronting [the absent] witness against any proffered good cause for denying such confrontation" and that the evidence would be "inadmissible" unless it made "a finding of good cause." JA 190. The court next found the government had shown good cause and explained the basis for that determination. The court also found that "the totality of the evidence" showed the absent witness's statements were "reliable" and that the overall "balancing test . . . weigh[ed] in favor of admissibility." JA 191. That is exactly how district courts are supposed to proceed. See *Wheeler*, 130 F.4th at 417 (courts must conduct the required "balancing" of the various interests "on the record").

### A.

On good cause, Williams challenges both what the government did and when it did it. Both arguments fail.

First, Williams asserts the government's efforts to locate the complainant were insufficient. The district court concluded otherwise, and we see no abuse of discretion in that determination. The probation officer testified that she called, texted, and emailed the complainant and visited her last known address. To be sure, we might struggle to find good cause if the government knew where the complainant was living, went there once, and simply failed to follow up. Cf. *Wheeler*, 130 F.4th at 418 (concluding that "a single attempt to visit [a person's] known address" was insufficient to show good cause). But the district court committed no abuse of discretion in finding good cause here.

Second, Williams asserts the government's efforts to contact the complainant came too late. He notes that the probation officer "did not give a date" for when she called, texted,

8

and emailed the complainant and that the probation officer's visit to the complainant's last known address came after the first revocation hearing at which he "objected to the admission of hearsay evidence." Williams Br. 10–11. Williams thus asks us to assume as a factual matter that the government made no effort to secure the complainant's attendance until after the first revocation hearing and to conclude as a legal matter that this fact precludes a finding of good cause. We decline that invitation.

No doubt, the timing of when the government seeks to contact a prospective witness can be relevant to the good-cause analysis. See *Wheeler*, 130 F.4th at 418. But Williams cites no authority requiring the district court to ignore the government's efforts to locate the complainant after he first raised an objection. The court made clear during the initial hearing that it was not deciding the admissibility question then and would not do so until it received briefing from the parties. We see no abuse of discretion in the district court's decision to consider all the evidence before it when it made the challenged admissibility determination. See *Doswell*, 670 F.3d at 530 (stating that a district court must make the good cause finding "prior to admitting" the challenged statements without referencing when an objection was first made). And even assuming all the government's efforts to contact the complainant post-dated the first revocation hearing, the district court did not abuse its discretion in concluding that that timing did not negate the sufficiency of the government's post-hearing efforts to contact the complainant.

## B.

We also reject Williams' attacks on the district court's reliability determination. Williams admits that some of the government's evidence—including the photographs and

the testifying witnesses' personal observations of the complainant's condition—corroborates her account that she was assaulted by someone. But Williams claims the complainant's statements were insufficiently reliable as a matter of law because none of the corroborating evidence "implicate[d]" him specifically. Williams Br. 8.

Williams' argument misunderstands the role of corroborating evidence in this context. No question, corroboration is relevant because the degree to which the details of an out-of-court statement accord with undisputed evidence bears on the reliability of the hearsay evidence. But the key question is reliability, not corroboration, and there is no requirement that the government produce extrinsic corroboration for each detail of an out-of-court statement as a precondition for admitting the statement in the first place. Instead, courts must ask whether there are sufficient indicia of trustworthiness—including, but not limited to, any corroborating evidence—to find an out-of-court statement reliable.

The district court did not abuse its discretion in determining the complainant's out-of-court statements were reliable. The complainant's account of being strangled and slapped was corroborated by bodycam footage and photos showing injuries to her neck and lip and blood on her shirt, as well as metadata showing that the photos from her cell phone were taken the same day she claimed to have been assaulted. The complainant's statements were further corroborated by a police officer's personal observations that her neck was bruised and her voice was "deep and raspy," something the officer testified is a sign of strangulation. JA 133. This evidence—none of which Williams challenges on appeal—matches the complainant's account and thus supports the district court's conclusion that her out-of-court statements were reliable.

10

But there were other indicia of reliability as well. For one thing, there was no concern about mistaken identification: the complainant named Williams as her attacker, a person she had known and been living with for years. The complainant also went to the police and spoke with the officers in person the day after the alleged assault took place. See *Navarette v. California*, 572 U.S. 393, 399–400 (2014) ("In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy."). She repeated the same story to different people (the police officer and the probation officer) on different days. See *United States v. Fontanez*, 845 F.3d 439, 443 (1st Cir. 2017) ("The consistency of a declarant's account of events may lend support to a finding of reliability."). And her account was "internally consistent" because the details she gave—including that she urinated during the attack—were consistent with strangulation. *Id.* The district court thus acted well within its discretion in concluding the complainant's out-of-court statements were reliable and that this Court's "balancing test . . . weigh[ed] in favor of . . . admissibility." JA 191.

\*      \*      \*

The district court's judgment is

*AFFIRMED*.

11